[Cite as *State v. J.S.*, 2016-Ohio-8267.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 15AP-959 |
| | | (C.P.C. No. 14CR-5787) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| [J.S.], | : | |
| Defendant-Appellant. | : | |

---

D E C I S I O N

Rendered on December 20, 2016

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Laura R. Swisher*, for appellee.

**On brief:** *Barnhart Law Office LLC*, and *Robert B. Barnhart*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, J.S., from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which he was found guilty of kidnapping and rape.

{¶ 2} On October 30, 2014, a grand jury returned an indictment charging appellant with one count of kidnapping, in violation of R.C. 2905.01, and one count of rape, in violation of R.C. 2907.02. The matter came for trial before a jury beginning August 18, 2015.

{¶ 3} The first witness for plaintiff-appellee, State of Ohio, was Reynoldsburg Police Officer Kyle Williams. On July 25, 2014, at 5:30 a.m., Officer Williams was

dispatched to the Barcelona Square Apartments, located on San Miguel Place, Reynoldsburg. According to the dispatch, a female caller reported that "she had been raped by her sister's ex-boyfriend." (Tr. Vol. I at 52.) The dispatch indicated that the name of the suspect was J.S.

{¶ 4} When Officer Williams arrived at the residence, R.B., the alleged victim, met him at the door; according to the officer, she "appeared upset physically and emotionally." (Tr. Vol. I at 57.) Two other police officers also arrived at the residence at approximately that same time. The officers collected items at the apartment, including a t-shirt that "was on the couch * * * and it had what appeared to be blood stains on it," a pair of underwear, a bra, and several blankets from the living room couch. (Tr. Vol. I at 61.) A friend drove R.B. to Grant Medical Center, and Officer Williams followed them in his cruiser; the officer remained with R.B. at the hospital until police detectives arrived.

{¶ 5} Reynoldsburg Police Officer David Burks was also dispatched to the San Miguel Place residence at 5:30 a.m. that morning after receiving a "sexual assault or rape call." (Tr. Vol. I at 79.) When Officer Burks arrived, Officer Williams was already speaking to R.B. The woman told the officers "she was sexually assaulted by someone she knew and that it happened on the couch in * * * the living room right inside the first floor of the apartment." (Tr. Vol. I at 80.)

{¶ 6} Officer Burks assisted the other officers in collecting evidence from the scene, and he took photographs of the apartment, including the living room area. Officer Burks also photographed R.B.'s neck; R.B. described being "choked during the incident," and the officer "noticed * * * red marks and possible bruising and * * * maybe a scratch or two on her neck." R.B. told Officer Burks that "she had taken out a tampon; she was on her cycle." (Tr. Vol. I at 84.) R.B. "had discarded that in the toilet upstairs." The officers did not collect that item as evidence as "it was actually in the toilet and we felt like it would be of no value." (Tr. Vol. I at 85.)

{¶ 7} R.B., age 27, testified that she moved back to the Columbus area in January 2014 and was residing with her mother in a condominium on San Miguel Place, Reynoldsburg. R.B. would often sleep on the couch at her mother's residence. She "kept * * * blankets on it and also a throw blanket over the back of the couch." (Tr. Vol. I at 100.)

{¶ 8}   R.B. has an older sister, C.B., who was dating appellant in 2014.  R.B. first met appellant approximately one month after she moved back to Columbus; appellant would sometimes be at C.B.'s residence when R.B. visited her sister. Appellant's nickname was "G."  (Tr. Vol. I at 102.)

{¶ 9}   R.B. was employed at a shoe store located in the Easton Mall.  On July 24, 2014, at approximately 11:00 p.m., R.B. met some friends after work, including an individual named A.A.; they met at Adobe Gila's, a bar located at Easton Mall.  R.B. had a beer, and "probably had a shot of Jack [Daniels]."  (Tr. Vol. I at 106.)  R.B. did not have a vehicle at the time, and her mother usually provided her transportation to and from work.  R.B.'s mother was out of town that weekend, and R.B. phoned her younger sister "and asked if she could come get me.  She didn't answer."  R.B. then phoned her older sister, C.B., who "said, [g]ive me a second and I'll call you back."  (Tr. Vol. I at 107.)

{¶ 10} C.B. called back "a few minutes later * * * and said, G is in the area and he can pick you up and take you to mom's."  (Tr. Vol. I at 107.)  While waiting for a ride, R.B. "walked over to [A.A.'s] house," and R.B. "called G a few times on my phone to let him know that I wasn't at Adobe's, I was over at [A.A.'s]."  (Tr. Vol. I at 108.)  A.A. resided at a nearby condominium, and R.B. "gave [appellant] the address of where he could pick me up at."  Appellant arrived on a Harley Davidson motorcycle and "came and knocked on the door once he got there."  (Tr. Vol. I at 108.)

{¶ 11} R.B. rode on the back of the motorcycle with appellant to her mother's residence in Reynoldsburg.  After arriving at the residence, appellant "asked to use the bathroom and I said, Yeah, no problem."  (Tr. Vol. I at 109.)  After appellant "was done using the bathroom he came out.  I was sitting on the couch and he sat on the couch."  (Tr. Vol. I at 114.)  R.B. asked appellant "if he wanted something to drink."  (Tr. Vol. I at 114-15.)  She did not offer him any alcohol.

{¶ 12} R.B. testified that appellant then "leaned in to kiss me and I kind of looked at him confused.  I told him it was time for him to leave."  R.B. "stood up from the couch and asked him to go ahead and leave," and she reminded him "that he was dating my sister."  They both "headed toward * * * the hallway area and he got close to me in my personal space as if he was going to lean in again and I pushed him."  (Tr. Vol. I at 115.)

After pushing appellant, R.B. "took a few steps toward the front door and that's when he * * * choked me. He kind of pushed me up against the hallway." (Tr. Vol. I at 115-16.)

{¶ 13} R.B. testified that appellant had his hand on her "to the point where I * * * couldn't scream for help. He was choking me so hard it was hard to scream." Appellant then "grabbed me by my arm and led me over toward the couch and I was screaming and hitting, scratching, punching, everything I can do to try to get him to release me." (Tr. Vol. I at 116.) Appellant was "holding onto my arms and pushing me on the couch." (Tr. Vol. I at 117.)

{¶ 14} According to R.B., "[a]fter he pushed me on the couch, he put his hand on my thigh and moved my underwear over and I was yelling out, [s]top, don't do it. I told him I was on my period. I told him I had a tampon in. I was trying to do anything and everything to stop it and he didn't stop." Appellant "was laying on the couch and he spread my underwear. He stuck his [penis] inside of me." (Tr. Vol. I at 117.) Appellant was holding her shoulders down. R.B. "was trying to hit him and scratch him. I was yelling. I tried to do everything I could to stop it." (Tr. Vol. I at 118.)

{¶ 15} Appellant had a "motorcycle mask hanging * * * around his neck," and R.B. attempted to "grab and pull and hit him with that. And * * * after that, he got up" from the couch. R.B. "told him that I was telling my sister, and he said if you tell anyone about what happened * * * he was going to kill my sister." (Tr. Vol. I at 118.) R.B. took the threat seriously. Appellant pushed R.B. "up against the wall one more time, told me * * * not to say anything to anyone, that he would kill my sister and he left * * * the house." After appellant left, R.B. "felt weak" and "taken." (Tr. Vol. I at 119.)

{¶ 16} R.B. phoned her older sister, C.B., and "told her what had happened." R.B. "told her I was scared to go to the police because he made that threat of killing her." R.B.'s sister said: "If this is what happened, then you need to go straight to the police." (Tr. Vol. I at 120.) R.B. also phoned W.W., an individual she was dating at the time. Police officers were called to the residence, and W.W. arrived at approximately the same time as officers.

{¶ 17} R.B. later went to the hospital "[s]o we could do a rape kit." (Tr. Vol. I at 122.) At the hospital, R.B. spoke with police detectives and told them what happened.

Several days after the incident, R.B. moved out of state because she "was scared."  (Tr. Vol. I at 124.)  R.B. identified appellant at trial.

{¶ 18} On cross-examination, R.B. stated she did not recall walking to the Cheesecake Factory at the Easton Mall to wait for appellant to give her a ride.  Also during cross, defense counsel asked R.B. to review some telephone records and counsel inquired about a phone number linked to C.B., her older sister.  R.B. did not observe any calls she made to that particular number at the time of the events; R.B. stated that she called her sister using a different phone number.  Defense counsel also questioned R.B. about telling one of the officers that she had been "choked out" during the incident.  (Tr. Vol. I at 168.)

{¶ 19} On July 25, 2014, Reynoldsburg Police Detective Kevin McDonnell and another detective, after receiving information of an alleged sexual assault, spoke with R.B. at Grant Medical Center.   Detective McDonnell noticed that R.B. "had three scratches on * * * the left side of her neck."  (Tr. Vol. I at 191.)  After obtaining a statement from R.B. at the hospital, detectives prepared a photo lineup.  Detective McDonnell showed R.B. the photo lineup that day, and R.B. identified appellant's photograph from the array.

{¶ 20} Police officers arrested appellant on October 22, 2014.  A DNA sample was obtained from appellant at that time.  That evidence, as well as evidence from the rape kit, was submitted to the Ohio Bureau of Criminal Investigation ("BCI").   Detectives later received test results indicating that appellant's DNA "matched the * * * semen that was on the vaginal swabs" of R.B.  (Tr. Vol. I at 191.)

{¶ 21} On cross-examination, Detective McDonnell was questioned about a report he prepared as part of the investigation, identified as State's exhibit I. Detective McDonnell testified that he interviewed A.A. as part of the investigation.  In a statement contained in the report, A.A. related that, after he left Adobe Gila's bar on the morning of the events, he received a text from R.B. asking for a ride; A.A. spoke with appellant on that date to inform appellant where to pick up R.B.  A.A. indicated he drove R.B. to the Cheesecake Factory where appellant was to pick her up.  The detective also reported in the document that A.A. related R.B. was choked out three times by appellant.

{¶ 22} Sue Ann Van Woerkom is a registered nurse trained as a sexual assault nurse examiner.  On July 25, 2014, Van Woerkom performed an examination of R.B. at Grant Medical Center.  R.B. informed Van Woerkom that her assailant was a black male,

and "her sister's ex-boyfriend." (Tr. Vol. I at 227.) R.B. told Van Woerkom: "He strangled me on the neck." (Tr. Vol. I at 229.) R.B. related that she "tried to fight him off repeatedly saying he was with my sister." R.B. stated that "[h]e choked me out a few times," and that "[h]e strangled me a few times on the couch while I fought him." R.B. indicated that she "fought him a few times between the kitchen and the doorway." R.B. "tried scratching, hitting, punching, anything I could to get away." Her assailant "eventually pulled me back to the couch by my throat. He threw me on the couch, took my panties off. He began to rape me." (Tr. Vol. I at 233.) R.B. stated there had been "vaginal penetration." (Tr. Vol. I at 228.) After the incident, R.B. "told him I was going to tell my sister," and "[h]e said, [i]f you tell anyone, I'm going to kill her." (Tr. Vol. I at 233-34.) He then "walked out the door." (Tr. Vol. I at 234.)

{¶ 23} Van Woerkom noted bruising on R.B.'s left and right forearm, right chest and on the side of her neck. The whites of R.B.'s eyes were bloodshot; according to Van Woerkom, "[w]henever you have increased pressure, when you have a pinned victim or a choked victim * * * part of their eyes are bright red, very red." (Tr. Vol. I at 244.) The patient "was on day six of her period." (Tr. Vol. I at 235.) At trial, Van Woerkom identified photographs taken of R.B. at the time of the medical examination.

{¶ 24} Logan Schepeler is a forensic biologist with BCI. Police investigators submitted DNA samples to BCI, including samples obtained from appellant. Schepeler performed DNA analysis based on the samples and prepared a forensic biology report. The analysis of the vaginal swabs indicated the presence of DNA belonging to R.B. and appellant.

{¶ 25} C.B. testified on behalf of appellant. Appellant is the ex-boyfriend of C.B.; appellant and C.B. were dating at the time of events at issue. C.B. testified that the first time she spoke with R.B. on July 25, 2014 was "[a]fter the incident," at "about 3:00 in the morning." R.B. told C.B. that appellant "is going to kill us all." C.B. asked her why, and R.B. "said that he raped her and what should she do about it." (Tr. Vol. II at 288.) C.B. "told her to immediately call the police." (Tr. Vol. II at 288-89.) C.B. denied that R.B. phoned her earlier in the evening to get a ride home from appellant.

{¶ 26} When asked about her current relationship with appellant, C.B. testified that "[w]e remain friends." According to C.B., her "sister's statements that she had spoke

to me about was not consistent and * * * this has happened before with a recent * * * boyfriend." (Tr. Vol. II at 290.) C.B. testified that appellant had previously provided R.B. with rides home from work; C.B. "called [appellant] a couple times to have him pick her up from work." (Tr. Vol. II at 291.)

{¶ 27} Following deliberations, the jury returned verdicts finding appellant guilty of kidnapping and rape. The trial court merged the rape and kidnapping convictions for purposes of sentencing. By judgment entry filed September 25, 2015, the court sentenced appellant to eight years incarceration on the rape count.

{¶ 28} On appeal, appellant sets forth the following assignment of error for this court's review:

> APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 29} Under his single assignment of error, appellant challenges his convictions for kidnapping and rape as being against the manifest weight of the evidence, asserting that R.B.'s testimony was contradictory and impeached by other evidence. Specifically, appellant contends that the convictions are against the weight of the evidence because: (1) R.B. could not accurately describe where she went after leaving the bar, (2) R.B. did not call her sister to request a ride from appellant but, instead, called him directly according to her sister (C.B.) and phone records, (3) there was no damage to the apartment despite testimony as to an alleged fight, (4) there was no damage to R.B.'s underwear despite testimony that appellant pulled them aside, (5) R.B. indicated to her friend A.A. that she was "choked out" three times but never reported that elsewhere, and (6) R.B.'s own sister did not believe a rape occurred based on contradictions and a prior incident with another boyfriend.

{¶ 30} We note that, while appellant raises a manifest weight argument, he does not challenge the sufficiency of the evidence supporting his convictions, i.e., "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Walker,* 8th Dist. No. 96662, 2011-Ohio-6645, ¶ 14. While "sufficiency tests the burden of production," a manifest weight challenge "tests the burden of

persuasion."  *State v. Spikes,* 9th Dist. No. 05CA008680, 2006-Ohio-1822, ¶ 9, citing *State v. Thompkins,* 78 Ohio St.3d 380, 390 (1997).

{¶ 31} In reviewing a manifest weight challenge, an appellate court "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."  *State v. Munoz,* 10th Dist. No. 11AP-475, 2011-Ohio-6672, ¶ 8.  Further, "[r]eversals of convictions as being against the manifest weight of the evidence are reserved for exceptional cases where the evidence weighs heavily in favor of the defendant."  *State v. Pilgrim,* 184 Ohio App.3d 675, 2009-Ohio-5357, ¶ 32 (10th Dist.), citing *State v. Otten,* 33 Ohio App.3d 339, 340 (9th Dist.1986).

{¶ 32} As noted, appellant was convicted of one count of kidnapping and one count of rape.  R.C. 2905.01(A)(4) defines the offense of kidnapping and states in part: "No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will."  R.C. 2907.02(A)(2) defines the offense of rape as follows: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

{¶ 33} Appellant first contends R.B.'s testimony was unreliable because she could not accurately describe where she went after leaving the bar, i.e., where she was at the time appellant arrived to give her a ride to her mother's residence.  More specifically, appellant argues R.B. could not recall whether she went to her friend A.A.'s condominium, or whether appellant picked her up at the Cheesecake Factory at the Easton Mall.  According to appellant, A.A. denied that R.B. went to his condominium.

{¶ 34} In response the state notes that, while appellant contends A.A. denied R.B. was at his condominium, A.A. did not testify at trial; rather, appellant's citation is to defense counsel's cross-examination of Detective McDonnell regarding a summary report the detective prepared following an interview with A.A.  The state further notes that the summary report was not admitted into evidence.

{¶ 35} The record indicates that R.B. testified on direct examination that she waited "a while at the bar," and then walked "across the way to those condominiums and went over to my friend's and waited there for [appellant] to come pick me up." (Tr. Vol. I at 107-08.) When questioned on cross-examination whether A.A. walked with her to the Cheesecake Factory to wait for appellant to give her a ride, R.B. responded: "I don't recall." Defense counsel asked R.B. why she did not recall, and she responded: "I don't remember." (Tr. Vol. I at 140.)

{¶ 36} As noted by the state, the statement purportedly in conflict with R.B.'s account was that of a non-testifying witness contained in a detective's summary report. To the extent appellant sought to impeach R.B. by showing a discrepancy between her testimony and a statement in the summary report, any such conflict was an issue of credibility to be resolved by the jury. *See State v. Alexander*, 4th Dist. No. 10CA3402, 2012-Ohio-2041, ¶ 21 (whether defense thoroughly impeached state's witness "was a matter for the jury to decide"). Further, despite the statement attributed to A.A. in the report, the jury could have still found R.B. to be a credible witness. *See State v. Hernandez,* 10th Dist. No. 09AP-125, 2009-Ohio-5128, ¶ 17 ("Although discrepancies in the victim's testimony may have impeached [her] credibility, the jury nonetheless chose to believe her.").

{¶ 37} Appellant also contends there was conflicting evidence as to whether R.B. called her sister to request a ride from appellant. Specifically, appellant points to phone records referenced by defense counsel as well as testimony by R.B.'s sister, C.B., who stated that R.B. did not call her about a ride.

{¶ 38} With respect to the testimony of C.B., the state argues that the credibility of this witness was questionable given her allegiance to appellant. Specifically, the state notes that C.B. is the ex-girlfriend of appellant and she acknowledged being on good relations with appellant at the time of trial. The state further notes that the phone records cited by appellant were not admitted at trial and are not part of the record on appeal.

{¶ 39} As noted under the facts, defense counsel questioned R.B. about a phone number linked to C.B.'s phone records. R.B. explained, however, that she had called her sister using a different number. On re-direct examination, R.B. further elaborated that her sister had "two different phones," and had more than one phone number. (Tr. Vol. I

at 172.)  Thus, the jury heard testimony that R.B. may have used a different number than the one suggested by defense counsel during cross-examination.  The jury, as trier of fact, was free to believe or disbelieve the testimony presented by the witnesses and to assess their credibility, including R.B.'s testimony that she phoned her sister about obtaining a ride.  *See State v. Erickson,* 12th Dist. No. CA2014-10-131, 2015-Ohio-2086, ¶ 42 ("as the trier of fact, the jury was free to believe or disbelieve all, part, or none of the testimony of the witnesses presented at trial").

{¶ 40}  Appellant next contends that, despite R.B.'s testimony of a struggle, there was a lack of evidence as to damage to her mother's residence.  In a similar vein, appellant contends there was no evidence of damage to R.B.'s underwear despite her testimony that appellant pulled the underwear aside during the incident.

{¶ 41}  During cross-examination, defense counsel questioned R.B. about her testimony that she struggled with appellant in the hallway prior to him forcing her onto the living room couch.  Counsel showed R.B. several photographs taken of her mother's residence, and questioned R.B. regarding her statement to police officers that she pushed appellant in the hallway near a picture on the wall.  When shown one photograph of the hallway, R.B. responded: "The only fighting area in this [photograph] is when he first choked me * * * up against this wall right there (indicating) leading into the kitchen.  Where I pushed him at – you cannot tell from this picture, but on this wall to the left is a picture."  (Tr. Vol. I at 158.) R.B. also testified that her underwear was not removed during the incident; rather, "[t]hey were slid to the left."  (Tr. Vol. I at 160.)

{¶ 42}  On review, we do not find the purported absence of evidence with respect to damage to the apartment undermines the verdict.   R.B. testified that appellant began to choke her in the hallway, and that he grabbed her arm and led her toward the couch; according to R.B., she was struggling to get away from appellant, but he was "holding onto my arms and pushing me on the couch."  (Tr. Vol. I at 117.)  The jury also saw photographs of R.B. and heard testimony from other witnesses as to red marks and/or bruising to R.B.'s neck following the incident.  It was within the province of the jury to draw its own conclusions as to whether a struggle took place in the residence.  Finally, as noted by the state, R.B. did not testify that her underwear was torn or damaged during the incident,

and the jury was not required to accept the defense's suggestion that it should have been damaged.

{¶ 43} Appellant further contends that R.B. told her friend A.A. that appellant choked her out three times, but that she did not report that elsewhere. As noted by the state, however, A.A. did not testify at trial, and the comment cited by appellant is from a detective's summary of a statement made by A.A. relating an account purportedly provided by R.B.

{¶ 44} The record indicates that defense counsel, during cross-examination, questioned R.B. about telling one of the officers she had been "choked out," and what that meant to her. R.B. explained: "To the point where you -- where you're being choked and you see black, but I still had full consciousness." (Tr. Vol. I at 168.) While appellant contends R.B. did not report being choked out three times to anyone other than A.A., we note that Van Woerkom, the nurse examiner, testified that R.B. reported to her that appellant "choked me out a few times," and "[h]e strangled me a few times on the couch while I fought him." (Tr. Vol. I at 233.) On review of the record, we do not view the statement in the report nor R.B.'s testimony on this issue as casting doubt on the jury's verdict.

{¶ 45} Finally, appellant points to testimony by R.B.'s older sister indicating she did not believe R.B.'s account. The jury heard testimony, however, regarding C.B.'s close relationship with appellant, including the fact that she was dating him at the time of the incident, and that she acknowledged she "remain[ed] friends" with him subsequent to the events at issue. (Tr. Vol. II at 290.) Here, the trier of fact had the task of assessing the credibility of C.B., including her prior and current relationship with appellant and any potential bias.

{¶ 46} Based on this court's independent review, we find that the purported inconsistencies cited by appellant do not undermine the jury's verdict. Under Ohio law, "[t]he trier of fact is in the best position to take into account any inconsistencies, the demeanor of the witnesses, and the manner of testifying to determine whether the witnesses' testimony is credible." *State v. Howard,* 10th Dist. No. 15AP-444, 2016-Ohio-7125, ¶ 23. Further, "[w]hile the jury may take note of the inconsistencies and resolve them or discount them accordingly, * * * such inconsistencies do not render defendant's

conviction against the manifest weight or sufficiency of the evidence." *Id.,* quoting *State v. Nivens,* 10th Dist. No. 95APA09-1236 (May 28, 1996). *See also State v. Raver,* 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21 ("A defendant will not be entitled to reversal on manifest weight or insufficient evidence grounds merely because inconsistent testimony was heard at trial.").

{¶ 47} In the instant case, defense counsel did not dispute that appellant was the source of the DNA evidence; rather, the defense's theory was that the encounter was consensual. As noted above, however, the jury heard contrary evidence, and the trier of fact was free to believe or disbelieve the testimony of R.B. in which she stated appellant grabbed her in the hallway, began to choke her, led her to the couch and engaged in sexual intercourse without her consent. Here, the testimony of R.B., if believed, was sufficient to support the convictions for kidnapping and rape. In addition to R.B.'s testimony, the state also presented other evidence supporting her account, including medical and DNA evidence, and the testimony of the nurse examiner and police personnel who described the demeanor of R.B. after the incident and observed bruises to her neck and other areas of her body.

{¶ 48} On review of the record before this court, we cannot conclude that the jury lost its way and created a manifest miscarriage of justice in returning verdicts finding appellant guilty of kidnapping and rape. Accordingly, appellant's convictions are not against the manifest weight of the evidence.

{¶ 49} Based on the foregoing, appellant's single assignment of error is overruled and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

KLATT and BRUNNER, JJ., concur.

_____