[Cite as *State v. Hodge*, 2019-Ohio-4012.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 18AP-95 |
| v. | : | (C.P.C. No. 15CR-4901) |
| Jason T. Hodge, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on September 30, 2019

**On brief:** *Ron O'Brien,* Prosecuting Attorney, and *Sheryl L. Prichard,* for appellee. **Argued:** *Sheryl L. Prichard.*

**On brief:** *Siewert & Gjostein Co. LPA,* and *Thomas A. Gjostein,* for appellant. **Argued:** *Thomas A. Gjostein.*

APPEAL from the Franklin County Court of Common Pleas

NELSON, J.

{¶ 1} Jason T. Hodge shot Maurice Randle in the head, killing him. After a trial in which the identity of the shooter was not at issue, *see* Appellant's Brief at 3, 7, a jury convicted Mr. Hodge of murder and of aggravated robbery (while acquitting him of aggravated murder and of murder charged in an alternate formulation). The trial judge sentenced him on the murder conviction to life in prison with the possibility of parole after 15 years, concurrent with 10 years in prison on the aggravated robbery count, but consecutive to 3-year gun specifications on each of those two counts, for a total sentence of 21 years to life.

{¶ 2} Mr. Hodge has appealed, maintaining that the prosecution's exercise of a peremptory challenge in removing an African-American from the ranks of potential jurors denied Mr. Hodge his right to equal protection of the law under the *Batson v. Kentucky* line

of precedent. He further submits that the trial court erred in not instructing the jury on voluntary manslaughter as an alternative to the murder charge, and in denying his motion for a mistrial after juror discussion of whether he was being held in jail pending resolution of the trial. And he argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. We find no merit to Mr. Hodge's arguments and we affirm the convictions.

### Batson challenge

{¶ 3}   Mr. Hodge's first assignment of error relates to the selection of the jury. He asserts: "The trial court denied the Appellant equal protection of the law, as guaranteed under the Fourteenth Amendment to the United States Constitution[,] by denying counsel's challenge under *Batson v. Kentucky*[, 476 U.S. 79 (1986).]"   Appellant's Brief at 10 (capitalizations adjusted and italics supplied). That *Batson* claim, as voiced in response to the state's exercise of a peremptory challenge to excuse prospective juror number 3, was somewhat less than full throated:

> [DEFENSE COUNSEL]: I just want the Court to note our objection for the record for a couple of reasons. There was no questioning of [Prospective Juror 3] that was any different than anybody else.
>
> THE COURT: Are you making a Batson challenge? Just say it, Tom.
>
> [DEFENSE COUNSEL]: Yes, it is a Batson issue.
>
> THE COURT: Thank you.
>
> [DEFENSE COUNSEL]: In a backdoor way.
>
> THE COURT: There's no such thing as a backdoor Batson challenge. You're either making it or you're not.
>
> [DEFENSE COUNSEL]: I'm making it.
>
> THE COURT: Ms. Geraghty?
>
> [COUNSEL FOR THE STATE]: Thank you, Judge. First of all, there's no pattern. We do have another African-American on the jury panel, * * * No. 8 right now. I didn't like the way she answered my questions about beyond a reasonable doubt, so that's why I got rid of her.

> THE COURT: State's stated a reason based on something other than race. Do you have any rebuttal, Mr. Gjostein?
>
> [DEFENSE COUNSEL]: My rebuttal would be that there is only two African-Americans that we have up here today, so it still could be only for one reason.
>
> THE COURT: The fact that there's--we could have pulled a panel with none. That doesn't give you a right to a redraw. Overruled.

Nov. 28, 2017 Supplemental Transcript at 143-44.

{¶ 4} *Batson* instructs that "[a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges 'for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried, the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."  476 U.S. at 89.

{¶ 5} The Supreme Court of Ohio has described *Batson*'s three-part test for analyzing a claim of race-based peremptory challenge as follows:

> First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination. Second, if the trial court finds this requirement fulfilled, the proponent of the challenge must provide a racially neutral explanation for the challenge. However, the "explanation need not rise to the level justifying exercise of a challenge for cause." Finally, the trial court must decide based on all the circumstances, whether the opponent has proved purposeful racial discrimination. A trial court's findings of no discriminatory intent will not be reversed on appeal unless clearly erroneous.

*State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, ¶ 106 (citations omitted).

{¶ 6} As Mr. Hodge acknowledges, the United States Supreme Court has reiterated that "a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous. The trial court has a pivotal role in evaluating *Batson* claims. Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, and 'the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises

the challenge.' " *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (citations omitted); *see also* Appellant's Brief at 11-12.

{¶ 7} Here, Mr. Hodge's lawyer made no serious attempt to articulate a prima facie case of racial discrimination. However, "[t]his departure from the normal course of proceeding need not concern us," because "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359 (1991) (adding at 369 that "the trial court had no occasion to rule that petitioner had or had not made a prima facie showing of intentional discrimination").

{¶ 8} The trial court turned to the prosecutor for an explanation of the peremptory challenge, and the prosecutor responded by expressing discomfort with the prospective juror's answers to questions about reasonable doubt. "A race-neutral explanation offered by the prosecution need not rise to the level of a challenge for cause." *State v. Santiago*, 10th Dist. No. 02AP-1094, 2003-Ohio-2877, ¶ 7, citing *State v. Cook*, 65 Ohio St.3d 516 (1992) (accepting race-neutral explanation regarding potential juror's criminal record). *See also Batson*, 476 U.S. at 98 (prosecution must "articulate a neutral explanation related to the particular case to be tried").

{¶ 9} The trial court then gave Mr. Hodge's attorney another opportunity to demonstrate that "purposeful discrimination" motivated the prosecutor's peremptory challenge. *Id.* His only response was to note that "there [were] only two African-Americans" in the jury pool, "so it still could be only for one reason." But that does not necessarily follow.

{¶ 10} Indeed, Mr. Hodge's own brief concedes that the responses of prospective juror number 3 to questions on the presumption of innocence and the reasonable doubt standard did in fact distinguish her from other members of the jury pool: her answers were, in the view of the defense, "the best of anyone on the venire." Appellant's Brief at 19. The defense evaluation of a good answer does not bind the prosecution to retain a potential juror, and the state's brief further explains the prosecutor's "skepticism" over the prospective juror's repeated insistence that should she see a red Corvette pulled over on the freeway by a highway patrolman, she "wouldn't think about" the possibility that the driver

might have been speeding. *See* Appellee's Brief at 22-23; Supp. Tr. at 37-38; *see also id.* at 39 (reasonably opining that proving something "beyond all doubt" could be "tough" but perhaps possible).

{¶ 11} In attempting to make his point about prospective juror 3, Mr. Hodge offers a disquisition on the treatment of prospective juror 8. Appellant's Brief at 16-17, 20. If the point of that recitation is to establish discriminatory motive with regard to the peremptory challenge of juror number 3 because although potential juror 3 "followed the concept of the presumption of innocence better than any other prospective juror questioned * * * *[,] [h]er answers on both issues were remarkably similar to [those of] Juror No. 8," *id.* at 20, any contrast fails because juror 8 was treated the same way: the state exercised a peremptory challenge with regard to him as well. Supp. Tr. at 131. And if the unstated defense point is that prospective juror 8 as quoted in Mr. Hodge's brief was African-American, too, the transcript doesn't appear to bear that out either; the state's brief is correct in observing that the transcript indicates that the second of the two prospective jurors identified by counsel as African-American was prospective juror 15, who replaced original juror 8 after the juror 8 answers quoted by Mr. Hodge and who served on the jury. *See* Appellee's Brief at 24-25; Supp. Tr. at 133, 143-44.

{¶ 12} Mr. Hodge also takes issue with what he sees as a suggestion by the state that it had not engaged in a pattern of peremptory strikes ousting prospective African-American jurors. Appellant's Brief at 12, 18 (noting that inferences of discriminatory purpose may be established from indications other than a "pattern" of strikes). But Mr. Hodge cites nothing to bolster his assertion that "the State clearly misinformed the Court about the law of a proper *Batson* objection when the argument was made that there was 'no pattern.' " *Id.* at 12, citing Supp. Tr. at 143-44 ("[w]e do have another African-American on the jury panel [former prospective juror 15, who had become juror 8]"). *Compare State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, ¶ 92 (citation omitted) ("the presence of African-Americans on a jury certainly does not preclude a finding of discrimination, but 'the fact may be taken into account * * * as one that suggests that the government did not seek to rid the jury of persons [of a particular] race' "). Moreover, the trial court is presumed to know the law and to have acted accordingly, *see, e.g., State v. Jones*, 10th Dist. No. 90AP-1083,

1991 Ohio App. Lexis 690, * 7-8, and what the state argues to a trial court generally does not invalidate that court's rulings.

{¶ 13} Further still, and in any event as we already have described, the trial court assumed a prima facie case under *Batson* and moved directly to seeking an explanation of the state's peremptory challenge. Having witnessed voir dire, including the prosecutor's questions and the responses of the prospective jurors, the trial court was well positioned to judge the demeanor of the participants as well as the substance of the inquiries, and it appropriately found that the state had "stated a reason [for the peremptory challenge] based on something other than race," and overruled the *Batson* challenge after allowing for reply. Supp. Tr. at 144.

{¶ 14} We overrule Mr. Hodge's first assignment of error.

### Sufficiency and weight of the evidence

{¶ 15} We turn next to Mr. Hodge's fourth assignment of error, which reads: "Appellant's conviction was not supported by the sufficiency of the evidence in violation of the due process clause of the Fourteenth Amendment to the U.S. Constitution and Article I, Sections 1 & 16 of the Ohio Constitution, and the conviction was also against the manifest weight of the evidence." Appellant's Brief at 35 (capitalizations adjusted).

{¶ 16} The jury convicted Mr. Hodge of one count of murder and one count of aggravated robbery, each with a three-year firearm specification. Jan. 10, 2018 Judgment Entry. The relevant definition of murder is established by R.C. 2903.02(B), which states that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * * ." *See* Dec. 14, 2017 Jury Instructions at 9. Here, that "offense of violence" was specified as felonious assault (a second-degree felony, here properly described as "knowingly causing serious physical harm to another and/or causing or attempting to cause physical harm by means of a deadly weapon") or aggravated robbery (a first-degree felony). *Id.* Aggravated robbery was the second offense of which the jury convicted Mr. Hodges: "No person, in attempting or committing a theft offense * * * or in fleeing immediately after the attempt * * *, shall do any of the following: * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it; * * *[or

recklessly] [i]nflict, or attempt to inflict, serious physical harm on another." R.C. 2911.01(A); Dec. 14, 2017 Jury Instructions at 6, 11. In addition, the jury found Mr. Hodge guilty of each of the two firearm specifications for these offenses. *See* R.C. 2941.145(A) (requiring the imposition of a three-year prison term where "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense"); Dec. 14, 2017 Jury Instructions at 11-12.

{¶ 17} To determine the legal sufficiency of the evidence, "[t]he relevant inquiry for an appellate court is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt." *State v. Miller*, 10th Dist. No. 14AP-851, 2015-Ohio-4678, ¶ 26, citing *State v. Mahone*, 10th Dist. No. 12AP-545, 2014-Ohio-1251, ¶ 38. By contrast, "[w]hen presented with a manifest weight of the evidence challenge, an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Reversal on manifest weight grounds is appropriate " 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 18} So we examine the evidence the jury heard. That included testimony from Officer Timothy Giannoti, who on the night of July 26, 2013 had responded to a report of a shooting at a Convenience Plus Food Mart on East Livingston Avenue. Tr. at 57-59. There he found the unconscious body of Mr. Randle with a "gunshot wound to his head." *Id.* at 63. On the ground next to the victim were "a spent shell casing; [a] baggie of marijuana; [and] a little bit of money * * *, a dollar bill or so." *Id.* at 67; *compare id.* at 174-77 (testimony of crime scene search detective Donald Jones, who described also finding "a cross and chain, like a necklace" in that location). Officer Giannoti accompanied Mr. Randle to the hospital and stayed with him until he died at 3:49 a.m. *Id.* at 69.

{¶ 19} M.W. was Mr. Randle's girlfriend. *Id.* at 82. She testified that on the night of July 26, 2013, she and Mr. Randle took his cousin to the Convenient Plus Food Mart to meet a "girl." *Id.* M.W. knew that Mr. Randle had a permit for carrying a concealed weapon, but said she had never seen him with a firearm during their three months of dating. *Id.* at 83. She also knew that Mr. Randle smoked marijuana and had some with him that night, but testified that "he never sold marijuana." *Id.* at 89.

{¶ 20} After Mr. Randle's cousin left with the female he had come to meet, M.W. and Mr. Randle stayed in the car talking with the windows down and Mr. Randle in the driver's seat. *Id.* at 84-86. M.W. was "on [her] cell phone on Facebook" when a man in a red t-shirt broke away from a group of men in front of the store and approached the driver's side of the car to engage in an "exchange of words" with Mr. Randle. *Id.* at 86-88. She "wasn't really paying attention to what exactly they were talking about," she testified, because she was "nervous" about the group of men; she "didn't really want to be in that situation." *Id.* at 87-88.

{¶ 21} As that exchange concluded, M.W. saw the man "reach his hands inside of the window, and then a tussle began to happen." *Id.* at 88. "And as the tussle, you know, kept going, he grabbed something out [of] the car and went to run off with it." *Id.* at 89. Mr. Randle "got out of the car behind him and ran up on him," at which point the man "pulled out a gun and pointed it towards him." *Id.* at 90. Mr. Randle "ran up, but he didn't touch him. He didn't grab him. He didn't do anything to him." *Id.* at 111.

{¶ 22} The gun did not fire when the shooter "initially tried to shoot it," and M.W. believed that he then "took the safety off or something" before it discharged. *Id.* at 90-91 ("And then it shot. Then he shot him"). According to M.W., the man she later identified as Mr. Hodge "shot [Mr. Randle] with the gun, and [Mr. Randle] blocked it with his left hand, and it went through his hand and it hit the back of his head. I didn't know that at the time. I just thought it went through his hand. But I seen him block the bullet, like trying to block it from hitting him in the face." *Id.* at 91. Mr. Randle "didn't have anything in his hands" when he was shot. *Id.*

{¶ 23} M.W. was shown a photo array of suspects the next day by the police, but did not identify one as the shooter. *Id.* at 96. She was shown another array several days later, and although she believed one of the photos "look[ed] like him," she did not believe it was

the shooter. *Id.* at 98. Several weeks later, police showed M.W. surveillance video from the night of the shooting and identified a man in a red shirt on the tape as the man who shot Mr. Randle. *Id.* at 101. During her testimony, she identified that man as the defendant in the courtroom. *Id.* at 102.

{¶ 24} S.M. also witnessed the shooting. She had shopped at the Convenient Plus Food Mart that night, and was back at her car when she heard a "commotion." *Id.* at 235. S.M. saw Mr. Hodge "backing up" from a car, at which time "the other person got out of the vehicle; and while they were slamming the door, he raised a gun." *Id.* at 236.

{¶ 25} She recounted:

> I look up. I see the door closing. I see him backing up. I see the gun getting pulled up. I see the guy just standing there kind of stuck, and he went to pull the trigger. The trigger didn't go. The guy thought that that was his -- the guy started to go into, like, a tackle position running towards him. That's when he flipped the safety off.
>
> Q. And what happened once the safety was flipped off?
>
> A. The other guy got shot in the head.

*Id.* at 236-37.

{¶ 26} S.M. heard one shot, after which the victim fell. She recognized the shooter as an individual she had seen before "at a party or something" and knew as "Bandy." *Id.* at 240-41. S.M. left the scene immediately because she "didn't want to get shot." *Id.* at 240. She went to the police the next morning. *Id.* at 243-44. On a subsequent visit, the police showed her surveillance video and she identified Mr. Hodge as the shooter. *Id.* at 246. Again during her testimony, S.M. identified Mr. Hodge as the shooter. *Id.* at 241. She also identified him in a still photo procured from the surveillance video as the man in the red shirt. *Id.* at 247.

{¶ 27} W.H. and his wife "run the block watch" in the neighborhood and are at the store "probably three or four nights a week, just watching the area." *Id.* at 265. W.H. knew "Bandy," and that his given name was Jason Hodge. *Id.* at 273-74. On the night of the shooting, he and his wife were sitting in a car in the store's parking lot. *Id.* at 271. When "the gunshot went off," he "ran to the victim." *Id.* at 277-78. W.H. testified that a woman he believed "was the girl that was in the car" came up "screaming and hollering saying 'The

guy in the red shirt did it. The guy in the red shirt did it.' " *Id.* at 279. W.H. later reviewed the surveillance video and identified Mr. Hodge pictured wearing a red shirt. *Id.* at 282-83.

{¶ 28} Lead detective Jennifer Gribi testified that three days after the shooting, Mr. Randle's father called her and reported that his 9 mm Taurus Millennium handgun was missing. *Id.* at 390-91. Police recovered that weapon from a juvenile more than five years later, *id.* at 392, and a forensic scientist from the Columbus Police Crime Lab firearms unit, Erica Pattie, testified that it matched the spent cartridge case recovered from the scene of the shooting. *Id.* at 361-62, 380-84. Her testing of the bullet fragment recovered from Mr. Randle's body was "inconclusive." *Id.* at 385.

{¶ 29} Kimberly Sharrock, a latent finger print examiner from the Columbus Police Crime Lab, examined a number of prints taken from Mr. Randle's car. *Id.* at 316, 324-25. The parties stipulated that five of the prints belonged to Mr. Randle. *Id.* at 326. Ms. Sharrock testified that one of the prints "was identified to the left palm of Jason Hodge." *Id.* at 329; State's Ex. I-4.

{¶ 30} In short, and when viewed in the light most favorable to the state, the evidence was legally sufficient to support every element of murder, aggravated robbery, and the firearm specifications. M.W.'s testimony that Mr. Hodge "took something" during the "tussle" with Mr. Randle, corroborated by Mr. Hodge's palm print on the car door and the items then found on the ground at the scene, support the element of theft in aggravated robbery. In that context, and although M.W. did not see what Mr. Hodge took, Mr. Randle's attempt to pursue him (witnessed by both M.W. and S.M.) also supports the inference that a theft occurred. What Mr. Hodge took is suggested, too, by his immediate use of a gun belonging to the victim's father. And his display and use of the gun, as described by both M.W. and S.M., along with the ultimate serious physical harm inflicted on Mr. Randle, are more than sufficient to meet the remaining elements of aggravated robbery.

{¶ 31} The testimony also was legally sufficient to show murder in that the death of Mr. Randle was the proximate cause of Mr. Hodge's attempt to commit aggravated robbery or felonious assault. Both M.W. and S.M. testified to witnessing Mr. Hodge shoot Mr. Randle: the testimony was that Mr. Hodge "pointed [the gun] towards [Mr. Randle]," tried to shoot, and then shot. *See* Tr. at 90-91 (Testimony of M.W.).

{¶ 32} Mr. Hodge concedes that "identification was not a contested issue in this matter" and repeats that "identification of the Appellant [as the shooter] was not a contested issue in this case." Appellant's Brief at 3, 7. The state's evidence was legally sufficient to support each count and specification of which he was convicted, and he does not essay any specific argument to the contrary. Nor does he take issue with any particular jury instruction that was given or with any particular jury verdict form.

{¶ 33} Rather, he argues here only that M.W.'s testimony "was simply unbelievable" in disclaiming any knowledge about whether Mr. Randle "was a drug dealer and was carrying a gun in the car at the time of the incident." *Id.* at 38. That contention is in the form of a manifest weight argument, for "[i]n a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility, rather it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime." *State v. Hill*, 10th Dist. No. 07AP-889, 2008-Ohio-4257, ¶ 41; *see also, e.g., State v. Turner*, 10th Dist. No. 04AP-364, 2004-Ohio-6609, ¶ 13 ("appellant's sole contention as to why the evidence was insufficient is that the testimony of the state's witnesses * * * lacked credibility and was inconsistent with statements given to the police. However, whether the evidence is legally sufficient is a question of law, not fact"). But Mr. Hodge's argument fails on its own terms even under a weight of evidence analysis: whether or not Mr. Randle was dealing drugs, the jury still would have been free to conclude that Mr. Hodge reached into Mr. Randle's car to grab the drugs and the gun, along with the other items later found on the ground, and that as events unfolded he then shot Mr. Randle. "The trier of fact is free to believe or disbelieve all or any of the testimony." *State v. Webb*, 10th Dist. No. 10AP-189, 2010-Ohio-5208, ¶ 16 (also noting that "[t]he trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible") (citations omitted).

{¶ 34} Given the eyewitnesses to the shooting and the identifications of Mr. Hodge at the scene, and the testimony regarding the robbery including the further evidence that the gun he fired belonged to the victim's father and the evidence of Mr. Hodge's handprint on the car, we cannot conclude that the jury lost its way and that its decisions to convict Mr.

Hodge resulted in a miscarriage of justice. Accordingly, we overrule the fourth assignment of error.

### Denied instruction on voluntary manslaughter

{¶ 35} Mr. Hodge's argument that Mr. Randle was a drug dealer appears designed primarily to relate to the second assignment of error: "The trial court violated the Appellant's right to a fair trial under the Sixth Amendment and due process under [the] Fourteenth Amendment of the United States Constitution and Article I of the Ohio Constitution in committing substantial prejudice, by denying the Appellant's request for the jury to be instructed on the lesser-included charge of voluntary manslaughter." Appellant's Brief at 21 (capitalizations adjusted). But we find that the trial court did not err, let alone abuse its discretion, in declining to instruct the jury on voluntary manslaughter as a lesser included offense of the murder charge. *Compare State v. Word*, 10th Dist. No. 17AP-367, 2019-Ohio-1733, ¶ 30 ("We review a trial court's refusal to give a requested jury instruction for an abuse of discretion").

{¶ 36} "[A] defendant charged with murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter." *State v. Shane*, 63 Ohio St.3d 630, 632 (1992) (citations omitted); *see also, e.g., State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶ 130. R.C. 2903.03(A) defines the contours of that lesser, voluntary manslaughter, offense: "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *." "Before giving a voluntary-manslaughter instruction in a murder case, the trial court must determine 'whether evidence of reasonably sufficient provocation occasioned by the victim has been presented to warrant such an instruction.' " *Conway*, 108 Ohio St.3d at 238-39, quoting *Shane* at paragraph one of the syllabus.

{¶ 37} "In determining whether [any such] provocation is reasonably sufficient to bring on sudden passion or a sudden fit of rage, an objective standard must be applied. Then, if that standard is met, the inquiry shifts to the subjective component of whether this actor, in this particular case, actually was under the influence of sudden passion or in a

sudden fit of rage." *Shane*, 63 Ohio St.3d at 634. Thus, the first, objective, inquiry is "whether the alleged provocation is reasonably sufficient to bring on a sudden passion or fit of rage * * * * 'sufficient to arouse the passions of an ordinary person beyond the power of his or her control.' " *State v. Mack*, 82 Ohio St.3d 198, 201 (1998), quoting *Shane*.

{¶ 38} And as the Supreme Court of Ohio has emphasized: "Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." *Id.* at 201 (multiple citations omitted).

{¶ 39} Mr. Hodge's argument is predicated on his view that he "had every reason to believe that, if the victim retrieved his weapon from [him], the victim would use it on [him]." Appellant's Brief at 27. But Mr. Randle's action in leaving his vehicle and pursuing Mr. Hodge, unarmed, even if he then adopted the "tackle position" described by S.M., was insufficient as a matter of law to constitute the provocation necessary to instruct on or reasonably find voluntary manslaughter. Here, as in *State v. Stevenson*, 10th Dist. No. 17AP-512, 2018-Ohio-5140, ¶ 25, "there is no evidence in the record that [the defendant] acted under a sudden passion or fit of rage." Shooting someone "out of fear rather than rage or passion [does] not support a jury instruction for voluntary manslaughter." *Id.* at ¶ 29. Put another way, evidence "that the defendant feared for his own and other's personal safety, does not constitute sudden passion or fit of rage as contemplated by the voluntary manslaughter statute." *State v. Harris*, 129 Ohio App.3d 527, 535 (10th Dist.1998) (citations omitted).

{¶ 40} As did the defendants in *Stevenson* and *Harris*, Mr. Hodge "relies extensively on this court's decision in *State v. Roddy*, 1981 Ohio App. Lexis 10292 (Nov. 17, 1981), Franklin App. No. 81AP-499, unreported (1981 Opinions 3706), for the proposition that fear for one's own safety is sufficient to warrant a voluntary manslaughter instruction." *See Harris*, 129 Ohio App.3d at 535; Appellant's Brief at 25-26. As there, "such reliance is misplaced." *Harris* at 535. We have explained before, and reiterate here, that this aspect of *Roddy* did not survive amendment to the voluntary manslaughter statute. "[G]iven that voluntary manslaughter now requires that the defendant be under the influence of 'sudden passion or fit of rage,' the position advanced by appellant and supported by *Roddy* cannot be * * * maintained." *Id.* (citations omitted); *see also, e.g., Stevenson*, 2018-Ohio-5140 at ¶ 27-28 ("This court has previously explained * * * why reliance on *Roddy* is misplaced

[citing *Harris* and *State v. Caldwell*, 10th Dist. No. 98AP-165, 1998 Ohio App. Lexis 6220].
* * * * At the time that *Roddy* was decided, voluntary manslaughter was defined as knowingly causing the death of another while under extreme emotional stress brought on by serious provocation reasonably sufficient to incite the use of deadly force. * * * * R.C. 2901.03(A), however, was amended in 1982 to limit the application of the voluntary manslaughter statute * * * * [and] require[ ] that the defendant be under the influence of sudden passion or in a sudden fit of rage").

{¶ 41} Mr. Hodge's speculation in his brief about what the victim might have done had he somehow taken the gun Mr. Hodge held does not provide an evidentiary basis that could reasonably support a finding of voluntary manslaughter as resulting from sudden passion or a sudden fit of rage induced by serious provocation from the victim. We overrule the second assignment of error.

### Denial of mistrial/instruction to disregard whether defendant was jailed

{¶ 42} Mr. Hodge states for his third assignment of error that "[t]he trial court violated the Appellant's right to a fair trial under the Sixth Amendment and to due process of law under the Fourteenth Amendment to the United States Constitution, and Article I, Section 10 of the Ohio Constitution in denying Appellant's Motion for a mistrial after learning that at least one juror was told that Appellant was held in jail during trial and for the entirety of the proceedings of the case." Appellant's Brief at 30 (capitalizations adjusted).

{¶ 43} During the trial, a lawyer approached juror number 9 in the parking garage and had a conversation with her as they walked to the courthouse. The juror apparently asked the lawyer: "for a murder case, is the defendant being held in jail or prison, I don't know what the correct term is, leading up to the trial?" He responded: " 'Yes, unless it's bail or bond.' " Tr. at 491. Juror 9 disclosed to the court, too, that she "had been talking the night before [that conversation] with a couple of the jurors, like, 'Has the defendant been in jail this whole time? That's awful. It's been four years.' " *Id.* at 488.

{¶ 44} On the basis of those conversations, the defense moved for a mistrial, which the trial court denied. *Id.* at 494-97. The trial court did, however, remove juror 9, *id.* at 498-89, and then addressed the jury:

> It was brought to our attention yesterday that there's been --
> somebody approached one of the jurors and a discussion was

> had about the defendant possibly being incarcerated during the pendency of this proceeding; and that that discussion then may not have occurred among all of you, but it occurred among some of you.
>
> * * *
>
> Whether or not the defendant is incarcerated pending a trial has nothing to do with the facts of the case or the instructions that I give you.
>
> I need to know: Is there any one of you, with this information, either what I've told you or what you heard from other jurors, is there anyone -- and I remind you you're all still under oath.
>
> Is there anyone that can no longer be fair and impartial, follow the Court's instructions, and be fair and impartial to both the State and the defendant?
>
> If any of you feel that way because of this additional information or any discussions you've had, please, I need to know now.
>
> I'm hearing none.

*Id.* at 502-04.

{¶ 45} Under Crim.R. 33(A)(1), a trial court may order a new trial "on motion of the defendant" for a cause "materially affecting his substantial rights," including "[i]rregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial." "The grant or denial of an order of mistrial lies within the sound discretion of the trial court." *State v. Garner*, 74 Ohio St.3d 49, 59 (1995) (citations omitted.) "The granting of a mistrial is only necessary when a fair trial is no longer possible." *State v. Orlandi*, 10th Dist. No. 05AP-917, 2006-Ohio-6039, ¶ 11 (citations omitted).

{¶ 46} There may be situations in which the fact of a defendant's incarceration is presented in a way that erases the presumption of innocence to which he is entitled, undermining his right to receive a fair trial. *See, e.g.*, *Estelle v. Williams*, 425 U.S. 501, 504 (1976) ("an accused should not be compelled to go to trial in prison or jail clothing because of the possible impairment of the presumption so basic to the adversary system"). This is not such a case.

{¶ 47} The Supreme Court of Ohio has noted that "it is self-evident" that a defendant on trial for murder has "been arrested. Evidence about a defendant's arrest and ensuing custody does not contravene the presumption of innocence." *State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, ¶ 75. And we have previously noted occasions on which jurors were not presumed to have been prejudiced by certain stray remarks related to a defendant's pretrial detention. *See State v. Dennison*, 10th Dist. No. 12AP-718, 2013-Ohio-5535, ¶ 79.

{¶ 48} The appropriate removal of juror 9 prevented potential detrimental effect to Mr. Hodge's trial resulting from her own musings and the conversation with the outside lawyer. And because "[a] jury is presumed to follow the instructions, including curative instructions, given it by a trial judge," *State v. Garner*, 74 Ohio St.3d 49, 59 (1995), we do not believe that under these circumstances the trial judge—who was able to observe the jurors first-hand—misused his discretion in continuing the trial after giving a proper curative instruction and making general inquiry of the jurors. The trial court told the jury that whether or not Mr. Hodge was incarcerated was irrelevant to the jury's task. Further, the court received the remaining jurors' assurance that they could be fair and impartial, and the written jury instructions subsequently provided guidance on the presumption of innocence.

{¶ 49} Mr. Hodge argues that *State v. Zimmerman*, 10th Dist. No. 18AP-75, 2019-Ohio-721, requires reversal on this issue. In *Zimmerman*, a juror saw potential evidence that the trial court earlier had excluded as unfairly prejudicial—a computer image of a knife—and "told the other jurors about it before they began their deliberations." *Id.* at ¶ 23. The trial court denied the defendant's motion for a mistrial because the defendant "had failed to prove that the knife picture 'contributed to [his] conviction' or was 'devastating' such that the jurors would have ignored the general instruction to confine their consideration of the case to the evidence presented." *See id.* at ¶ 22. We reversed, reasoning that "[b]y requiring proofs from Zimmerman in excess of what is required by law for supporting a motion for a new trial, and by concluding that no prejudice had been shown despite having already found that introducing the knife picture would have been prejudicial, the trial court acted unreasonably." *Id.* at ¶ 26.

{¶ 50}  This is not that.  *Zimmerman* involved the exposure of jurors to evidence that the court had concluded was unduly prejudicial. Here, by contrast, brief verbal reference to the possibility that Mr. Hodge was incarcerated pending the conclusion of trial did not, in itself, prejudice proceedings so as automatically to require mistrial. And his assertion that the jury "received confirmation" of his incarceration from the trial court after the dismissal of juror 9, Appellant's Brief at 34, misreads the judge's qualified statement that "a discussion was had about the defendant possibly being incarcerated during the pendency of this proceeding."  *See* Tr. at 502.  The trial judge's careful phrasing, in addition to the assurance he sought and received that the jury would remain fair and impartial, convince us that the trial court did not err when it denied the motion for a mistrial. Accordingly, the third assignment of error is overruled.

### Conclusion

{¶ 51}  Having overruled all assignments of error, we affirm the judgment of the trial court.

*Judgment affirmed.*

BRUNNER and BEATTY BLUNT, JJ., concur.

————————————