# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

KIMANI O. HODGES,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 18 MA 0091**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 16-CR-169

**BEFORE:**
David A. D'Apolito, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Paul J. Gains*, Mahoning County Prosecutor*, and *Atty. Ralph M. Rivera*, Assistant Prosecuting Attorney, 21 West Boardman Street, 6th Floor, Youngstown, Ohio 44503, for Plaintiff-Appellee and

*Atty. Joseph Gardner,* 19 East Front Street, Youngstown, Ohio 44503, for Defendant-Appellant.

Dated: December 6, 2019

_____

**D'Apolito, J.**

{¶1}  Appellant Kimani Hodges appeals his conviction by the Mahoning County Court of Common Pleas following a jury trial for one count of aggravated murder, in violation of R.C. 2903.01(A), an unclassified felony, with a firearm specification, in violation of R.C. 2941.145(A).  The trial court also found Appellant guilty of having a weapon while under disability, a violation of R.C. 2323.13(A)(2)(B), a felony of the third degree.

{¶2}  In his sole assignment of error, Appellant argues that the trial court erred when it refused to provide a jury instruction on voluntary manslaughter.  Voluntary manslaughter is defined as knowingly causing the death of another "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force." R.C. 2903.03(A).

{¶3}  Because there is no evidence in the record that a reasonable person would have been seriously provoked by the victim's words or actions, or that Appellant acted under the influence of sudden passion or in sudden fit of rage, we find that the trial court did not abuse its discretion in declining to provide the requested instruction.  As a consequence, we affirm Appellant's aggravated murder conviction.

## FACTS AND PROCEDURAL HISTORY

{¶4}  On February 17, 2016, the body of Jason Fonseca, age nineteen, was found at the bottom of the driveway of his mother's residence at 176 Ayers Street on the east side of Youngstown.  Fonseca had been shot nine times.

{¶5}  Later that day, Appellant was arrested and charged with aggravated murder in Youngstown Municipal Court. A video initial appearance was held on February 19, 2016.  The matter was set for a preliminary hearing on February 26, 2016.

{¶6}  On February 25, 2016, Appellant was indicted by the Mahoning County Grand Jury for aggravated murder, and the state dismissed the charge pending in the municipal court.  That same day, Angel Bell, who was involved in amorous relationships

with both men prior to Fonseca's death, was also indicted for aggravated murder, as well as one count of obstructing justice.

{¶7} The first trial began on January 3, 2017. Fonseca's lifelong friend, Noel Rios, was the only eyewitness to the crime offered by the state. After Appellant's counsel underscored a series of inconsistencies between Rios' direct testimony and his initial police interview, Rios, who was in federal custody at the time, abruptly refused to continue answering questions on cross-examination.

{¶8} After the trial court granted Appellant's motion to strike Rios' testimony in its entirety, the state informed the trial court that it had reached an agreement with Bell. Although Bell had previously maintained that she was not present when the fatal shooting occurred, Bell agreed to provide a proffer to the state that day and to testify against Appellant, in exchange for the dismissal of the charges against her with prejudice.

{¶9} Appellant's counsel moved for a mistrial based on his lack of awareness of the content of Bell's proffer and the potential testimony she would provide at trial. Without objection from the state, the trial court granted the mistrial on January 9, 2017.

{¶10} On January 23, 2017, with leave of court, Appellant filed a motion to dismiss the charges against him on double jeopardy grounds. He argued that the mistrial was the result of prosecutorial misconduct. The trial court overruled the motion on February 3, 2017. On January 30, 2018, we agreed that the prohibition against double jeopardy did not bar Appellant's retrial. *State v. Hodges*, 7th Dist. Mahoning No. 17 MA 0025, 2018-Ohio-447, 105 N.E.3d 543.

{¶11} The second trial began on June 4, 2018. Both Bell and Rios testified on behalf of the state, however Bell's testimony was riddled with "I don't know"s and "I don't remember"s. Bell testified that she and Fonseca had been romantically involved since 2014. Although problems had developed with their relationship in 2015, Bell declined to characterize the relationship as "on again/off again," but, rather "[always on] for the most part." (Trial Tr., p. 247-248.) At some point, Bell began a romantic relationship with Appellant.

{¶12} Fonseca and Bell purchased a used automobile in January of 2016. According to Fonseca's mother, Fonseca paid for the automobile but did not have a driver's license. Because Bell was involved in an accident two days after Fonseca

purchased the automobile, Fonseca hid the car in order to prevent Bell from driving it. Fonseca was not aware at that time that he possessed the only set of keys.

{¶13} Bell and Fonseca broke up at some point thereafter and Fonseca refused to give the keys to the automobile to Bell. In the week leading up to Fonseca's fatal shooting, Bell made a number of failed attempts to retrieve the keys. Fonseca's mother testified that Bell and Appellant stopped at her home on Ayers Street, where Fonseca was residing after the break-up, two days before Fonseca's death, but, per her son's instructions, she did not answer the door.

{¶14} The prior calculation and design element of the aggravated murder charge was established at trial through a series of messages posted to various social media accounts in the five days leading up to Fonseca's death. Copies of the social media messages were not admitted at trial, however, they were made a part of the record through Bell's testimony. Bell, who did not have a phone, communicated with both Fonseca and Appellant via Twitter on a Kindle.

{¶15} Bell testified that, at 9:10 a.m. on the day before Fonseca was murdered, he posted the message "I love you so much" in the Twitter chain with Bell that began on February 13, 2016. (*Id.* at 278.) At 9:16 a.m., Appellant posted, "Love yoself bitch ass nigga she mine now quick in box in n kikn her." (*Id.* at 278, 282.) Bell explained that Appellant appeared to mean "quit" not "quick" and that "in box in nkikn her" was a reference to Bell's Kik Messenger app.

{¶16} In a 3-second video posted on Bell's Kik Messenger video account, which was admitted into evidence, a man whose face is not visible wields a handgun and states, "We got them dicks [30 bullet clips]. I'll come to yo mama house, fuck boy, (unintelligible)." The man is wearing a large round-faced watch. Bell conceded that Appellant had used her Kik account around the time when the video was posted.

{¶17} Bell testified that she did not recognize the man in the Kik video. The state offered a photograph of Appellant taken on February 18, 2016 at 1:12 a.m. into evidence at the trial. Appellant was wearing a large round-faced watch in the photograph. Bell claimed that she could not determine from the picture whether the man in the video was wearing the same watch. However, Detective Sergeant Rick Spottleson later testified that the watch in the photograph was the same watch worn by the man in the video.

{¶18}  Finally, Bell testified that, at 10:51 a.m. on the day that Fonseca was fatally shot, Appellant posted to his own Facebook account, "Niggas want to fight? I'm like naww we toot pipes [shoot guns] you a be fightin for your life."  (*Id.* at 274.)

{¶19}  According to Bell's testimony, she was in the front passenger seat of Appellant's automobile on February 17, 2016.  Appellant, Bell, and another man, who she could not identify, were returning home from visiting friends when Appellant drove down Ayers Street.  Appellant recognized the occupant of a vehicle parked near the residence. He stopped his automobile and exited to talk to the occupant.  Appellant also conversed with another man who was standing on the street.  The man on the street gave Appellant a cigarette.

{¶20}  Bell testified that the confrontation between Appellant and Fonseca took place behind the automobile in which she was seated. According to her testimony, "[Fonseca] ran outside and, kind of, I don't know, I guess charged [Appellant]."  (*Id.* at 262.)  Then Bell heard gunshots and she saw Fonseca fall to the curb. (*Id.* at 263, 269.) Appellant returned to his automobile and then drove to a residence on the south side of Youngstown.  Bell testified that she could not recall whether Appellant said anything to her or the other passenger about the shooting while driving across town. (*Id.* at 265.)

{¶21}  After he was arrested, Appellant conversed with Bell on the telephone.  Bell testified that Appellant "wanted to delete his Facebook."  (*Id.* at 272.)  Although Bell claimed that she could not recall whether Appellant also asked her to delete his messages on her Twitter account, Bell deleted both the Facebook and Twitter messages.

{¶22}  Bell authenticated a letter she received from Appellant while he was incarcerated pending trial, which she read aloud at the trial:

> I'm so so so so sorry. I didn't listen to you when you said – I don't know what
> that says – forward.  I'm sorry.  Again, I didn't think shit through and I put
> your life, as well as my nephew and my brother, in jeopardy.  I was just so
> thirsty to get some money, didn't care where I was or what might or could
> have happened. Or maybe it wasn't – something – much as to me not caring
> but just being arrogant and not thinking about what if."

Bell testified that she did not know to what he was referring in the letter.  (*Id.* at 292.)

Case No. 18 MA 0091

**{¶23}** Raymond Ortiz, Fonseca's cousin, did not witness the shooting, but was in the residence on Ayers with Fonseca that day. Minutes before the shooting Fonseca tossed his "hoodie" to Ortiz and told him to get dressed and follow Fonseca outside because Appellant was en route to the residence. Fonseca exited the residence, but Ortiz stopped to put on his shoes. As Ortiz approached the door, he heard gunshots. Ortiz testified that his friend, Javaughn used Ortiz's mobile telephone to log into the Kik Messenger app and found the video.

**{¶24}** Rios testified that he was standing on the sidewalk smoking a cigarette when an automobile stopped in the street. Appellant, who acted as if he knew Rios, stepped out of the automobile and began conversing with him. Rios gave Appellant a cigarette, even though, at the time, he did not recognize him. Rios initially thought that there was another man in the car, because the other occupant was wearing a "hoodie." He explained that only men wear "hoodies," and, although he had previously seen Bell with Fonseca, she typically wore a large wig, so he did not immediately recognize her.

**{¶25}** Rios provided the following testimony regarding the interaction between Appellant and Fonseca prior to the fatal shooting:

> All I know is [Fonseca] came outside and it was a big argument that started off. And from there, it just led on to "get from in front of my property." And the guy said he wouldn't get from in front of the property like a couple times. And [Fonseca] said, I'm gonna beat you up, and they was supposed to fight. And the guy went to reach for a gun and they just started struggling. Like [Fonseca] rushed him and they started tussling * * * * And he shot several times. And I had took off and ran by the other car. And he looked at me before he got in, but I was ducked by the back of the trunk. I had lifted my head up, but I ducked down at the same time.

(*Id.* at 481.) Rios conceded that he fled after he saw the gun, but before he saw Appellant shoot Fonseca.

**{¶26}** Rios added, "[Fonseca] came out, he was out on the porch, they had their words, and he was just – come to find out, it was about a female. He told him, well, you

can have her, I don't care about her." (*Id.* at 483.)  Appellant's counsel objected to Rios' second statement as hearsay, and the objection was sustained by the trial court. However, Rios later testified that he recognized Bell when he realized the argument was about a woman, specifically, "when [Rios] came to think about when they was arguing and he told her, you could have the girl, the female, that how [Rios knew], okay, that had to be [Bell.]"  (*Id.* at 503.)

{¶27}  Rios testified that Fonseca did not have a gun, but that he was "trying to fight [Appellant] bare hands [sic]."  (*Id.* at 485.)  He further testified that Appellant refused to leave from the street several times, and "that's when [Fonseca] went to go fight, post up and box with him, and [Appellant] reached for a gun.  And that's when [Fonseca] rushed him, like to grab him, and [Appellant] shot him, boom, boom, several times." (*Id.* at 489.)

{¶28}  At the conclusion of the evidence, Appellant's counsel requested a jury instruction on voluntary manslaughter, based on the testimony that Fonseca engaged in a verbal argument and instigated a fist fight with Appellant.  Appellant's counsel argued that the evidence established that "[Appellant] like squares off and [Fonseca] charges him and then that's when [Rios] sees him pull the gun."  (*Id.* at 784.)  Trial counsel mischaracterized Rios' testimony, as Rios testified that Appellant drew the weapon as Fonseca approached him and Fonseca lurched at Appellant to prevent him from discharging the weapon.  The state countered that the social media messages offered at the trial established provocation on the part of Appellant, not Fonseca.  (*Id.* at 787-788.)

{¶29}  Based on the high-crime area in which the shooting occurred, the trial court confessed its initial inclination to provide the instruction. Nonetheless, the trial court refused to instruct the jury on voluntary manslaughter, stating:

> Here's my problem.  That's an instruction I am required to give  only if I am satisfied that there is evidence in the record that supports the elements of that offense, in particular [Appellant] being under the influence of sudden passion or in a fit of rage, either of which is brought on by serious provocation occasioned by the victim. So for discussion purposes, even if I assume that [Fonseca] * * * charged him, and I assume that constitutes a serious provocation, I still have no evidence in this record that [Appellant] is

under the influence of sudden passion or in a sudden fit of rage. And I don't believe I can allow the jury simply to speculate on that portion of the offense.

(*Id.* at 786-787.)

**{¶30}** The trial court ultimately recognized its "inability to bootstrap the evidence in this case in any fashion that would justify an instruction that's based upon [Appellant] being in a sudden fit of rage or passion under the circumstances. There's just no evidence on that subject." (*Id.* at 788.) The trial court did, however, instruct the jury on the lesser-included offense of murder.

**{¶31}** On June 8, 2018, the jury returned a guilty verdict on the charge of aggravated murder with the firearm specification. At a sentencing hearing held on August 10, 2018, the trial court found Appellant guilty of having a weapon while under disability. The trial court sentenced Appellant to life without the possibility of parole for the aggravated murder conviction, plus three years for the firearm specification to be served consecutively to the life sentence. The trial court further imposed a sentence of thirty months to be served concurrently for the weapon while under disability conviction. This timely appeal followed.

## ASSIGNMENT OF ERROR

**THE TRIAL COURT ERRED WHEN IT REFUSED TO INSTRUCT THE JURY ON VOLUNTARY MANSLAUGHTER WHEN THERE EXISTED SUFFICIENT EVIDENCE TO INSTRUCT THE JURY FOR INVOLUNTARY MANSLAUGHTER.**

**{¶32}** Aggravated murder is defined as "purposely, and with prior calculation and design, caus[ing] the death of another." R.C. 2903.01(A). Murder is defined as "purposely caus[ing] the death of another." R.C. 2903.02(A). In contrast, voluntary manslaughter is defined as knowingly causing the death of another "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force." R.C. 2903.03(A).

{¶33} Voluntary manslaughter is an inferior degree offense of murder, rather than a lesser included offense. *State v. Kanner*, 7th Dist. Monroe No. 04 MO 10, 2006-Ohio-3485, ¶ 17. This is true because the elements of the crime of voluntary manslaughter are contained within the offense of murder, except for one or more additional mitigating elements. *Id.*

{¶34} In order to find a defendant guilty of voluntary manslaughter when the defendant is charged with murder, the jury must find by a preponderance of the evidence that the provocation was sufficient to arouse the passions of an ordinary person and that the particular defendant's passions were aroused. *State v. Shane*, 63 Ohio St.3d 630, 634, 590 N.E.2d 272 (1992). Thus, the test has both an objective and a subjective component. *Id.* When determining whether the subjective portion of this test has been satisfied, "the emotional and mental state of the defendant, as well as the conditions and circumstances that surrounded the incident in question, must be considered." *State v. Perdue*, 7th Dist. Mahoning No. 00 CA 244, 153 Ohio App.3d 213, 2003-Ohio-3481, 792 N.E.2d 747, ¶ 11. Where insufficient evidence of provocation is presented and no reasonable jury could decide that the defendant was reasonably provoked by the victim, then no instruction on voluntary manslaughter can be given. *Shane, supra,* at 638.

{¶35} An appellate court reviews a trial court's decision whether to give a particular jury instruction under an abuse of discretion standard. *State v. Kaufman*, 187 Ohio App.3d 50, 2010-Ohio-1536, 931 N.E.2d 143, ¶ 103. An abuse of discretion connotes more than an error of judgment; it implies an attitude on the part of the court that is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E .2d 144 (1980).

{¶36} Appellant writes, "[Appellant] was under the influence of sudden passion or in a sudden fit or rage. [Fonseca's] words and actions provoked [Appellant] to *protect* himself." (Emphasis added)(Reply Brf., p. 7.) However, we have recognized that an instruction on voluntary manslaughter is generally incompatible with and contradictory to a defense of self-defense. *State v. Marcum*, 7th Dist. Columbiana No. 04 CO 66, 2006-Ohio-7068, ¶ 46 ("a self-defense theory is usually contradictory to proof of sudden passion or rage.")

**{¶37}** To establish self-defense through the use of deadly force, Appellant would have been required to prove: (1) that he "was not at fault in creating the situation giving rise to the affray"; (2) that he had "a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force"; and (3) that he "did not violate any duty to retreat or avoid the danger." *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002), citing *State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979), paragraph two of the syllabus. Furthermore, a person is privileged only to "use as much force as is reasonably necessary to repel [an] attack." *State v. Jackson*, 22 Ohio St.3d 281, 490 N.E.2d 893 (1986).

**{¶38}** While self-defense requires a showing of fear, voluntary manslaughter requires a showing of rage, with emotions of "anger, hatred, jealousy, and/or furious resentment." *Perdue, supra,* ¶ 12, quoting *State v. Harris*, 129 Ohio App.3d 527, 535, 718 N.E.2d 488 (10th Dist. 1998); see, also, *State v. Tantarelli*, 10th Dist. Franklin No. 94APA11-618, 1995 WL 318730. The Ohio Supreme Court has specifically held that "fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." *State v. Mack*, 82 Ohio St.3d 198, 201, 1998 Ohio 375, 694 N.E.2d 1328, see also *Kanner, supra*, ¶ 51-53; *State v. Williams*, 7th Dist. Jefferson No. 11 JE 7, 2012-Ohio-5256, ¶ 20-24; *State v. Stevenson*, 10th Dist. Franklin No. 17AP-512, 2018-Ohio-5140, ¶ 29 (shooting someone out of fear rather than rage or passion does not support a jury instruction for voluntary manslaughter). The Ohio Supreme Court has likewise held that "words alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations." *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 158.

**{¶39}** Earlier this year, the Tenth District distinguished their 1981 decision based on the previous version of R.C. 2901.03 in *State v. Hodge*, 10th Dist. Franklin No. 18AP-95, 2019-Ohio-4012. Relevant to the above-captioned appeal, the Tenth District explained:

> Mr. Hodge "relies extensively on this court's decision in *State v. Roddy*,
> 1981 Ohio App. Lexis 10292 (Nov. 17, 1981), Franklin App. No. 81AP-499,
> unreported (1981 Opinions 3706), for the proposition that fear for one's own
> safety is sufficient to warrant a voluntary manslaughter instruction." *See*

Case No. 18 MA 0091

*[State v.] Harris*, 129 Ohio App.3d [527,] 535, [718 N.E.2d 488]; Appellant's Brief at 25-26. As there, "such reliance is misplaced." *Harris* at 535. We have explained before, and reiterate here, that this aspect of *Roddy* did not survive amendment to the voluntary manslaughter statute. "[G]iven that voluntary manslaughter now requires that the defendant be under the influence of 'sudden passion or fit of rage,' the position advanced by appellant and supported by *Roddy* cannot be * * * maintained." *Id.* (citations omitted); *see also, e.g., [State v.] Stevenson*, [10th Dist. Franklin No. 17AP-512,] 2018-Ohio-5140 at ¶ 27-28 ("This court has previously explained * * * why reliance on *Roddy* is misplaced [citing *Harris* and *State v. Caldwell*, 10th Dist. No. 98AP-165, 1998 Ohio App. Lexis 6220]. * * * * At the time that *Roddy* was decided, voluntary manslaughter was defined as knowingly causing the death of another while under extreme emotional stress brought on by serious provocation reasonably sufficient to incite the use of deadly force. * * * * R.C. 2901.03(A), however, was amended in 1982 to limit the application of the voluntary manslaughter statute * * * * [and] require[ ] that the defendant be under the influence of sudden passion or in a sudden fit of rage").

*Id.* at ¶ 40.

{¶40} Rios' uncontested account of the shooting established that Fonseca ordered Appellant to leave the street and he was no longer interested in a romantic relationship with Bell. After repeated refusals by Appellant to leave the scene, Fonseca went to "go fight, post up and box" with Appellant, and Appellant reached for a gun. When Appellant drew the gun, Fonseca "rushed him, like to grab him" and Appellant shot Fonseca nine times. Bell testified that "[Fonseca] ran outside and, kind of, I don't know, I guess charged [Appellant]." (*Id.* at 262.) Although the Ohio Supreme Court qualified its conclusion that words alone will not constitute reasonably sufficient provocation to incite the use of deadly force *in most situations*, we find that the words exchanged by Appellant and Fonseca were insufficient to provoke deadly force based on the facts in this case.

**{¶41}** At most, the record establishes that Fonseca left the porch with the intent to engage in a fist fight with Appellant. While Fonseca's intent to engage in a fist fight might have caused fear in the average person, it would not evoke passion or a fit of rage.

**{¶42}** Furthermore, Ohio intermediate courts have consistently rejected the argument that a physical altercation constitutes serious provocation inspiring sudden passion or a fit of rage. For instance, in *State v. Thomas*, 9th Dist. Summit No. 27266, 2015-Ohio-2935, the defendant approached the victim, who was selling drugs in front of the residence of the defendant's grandmother. Thomas asked the victim to move down the street. The victim responded by threatening to physically assault Thomas. Thomas swung his fist at the victim, but did not connect. The victim then pulled out a gun, which Thomas knocked to the ground. Thomas gained control over the gun and shot the victim.

**{¶43}** At trial, Thomas explained that he fired the gun out of fear that the victim would take the gun from him and kill him. *Id.* at ¶ 25. He requested both a self-defense and voluntary manslaughter instruction. The court agreed to provide a self-defense instruction but declined to provide a voluntary manslaughter instruction based on Thomas' testimony that he shot out of fear, not because of provocation from the fight. *Id.* at ¶ 25. Thus, the Ninth District held that the evidence supported an instruction on self-defense, not voluntary manslaughter.

**{¶44}** In *State v. Perry*, 11th Dist. Trumbull No. 94-T-5165, 1997 WL 590789, (Aug 19, 1998), the defendant testified that he and the victim argued and the victim reached for his gun. The defendant testified that he attacked and beat the victim to death because he was afraid that she would shoot him. The defendant requested a voluntary manslaughter instruction, which the trial court denied. The Eleventh District found no abuse of discretion, because the defendant's testimony suggested self-defense, not voluntary manslaughter.

**{¶45}** Finally, we find that there is no subjective evidence of passion or rage on the part of Appellant in the record. Bell was the only witness who was present at the scene and accompanied Appellant after the fatal shooting. However, Bell testified that she could not recall anything that Appellant said during the car ride across town after the fatal shooting. In *Thompson, supra,* Thompson's only witness was present when Thompson shot the victim. She testified that Thompson got back in the car after the

shooting as they drove to his sister's house. The Ohio Supreme Court opined that "[h]er testimony provides no insight into Thompson's actual state of mind or level of agitation at the time of the shooting." *Thompson*, *supra*, ¶ 159. The same is true here.

{¶46} Based upon the foregoing case law, we find that a reasonable person would conclude that the verbal altercation and the threat of a physical assault in this case were objectively insufficient to inspire sudden passion or a fit of rage, and, further, that there is no evidence of actual passion or rage on the part of Appellant in the record. In fact, the record, which includes Appellant's violent threats via social media and his letter of apology to Bell, directly contradicts any argument that Appellant acted with sudden passion or in a fit of rage. Therefore, we find that the trial court did not abuse its discretion when it declined Appellant's request for a jury instruction on voluntary manslaughter, and Appellant's sole assignment of error has no merit.

## CONCLUSION

{¶47} In summary, we find that the words exchanged between Fonseca and Appellant and the threat of a physical altercation were insufficient from an objective standpoint to constitute serious provocation or to incite the use of deadly force by Appellant. We further find that there is no evidence in the record that Appellant was acting under the influence of sudden passion or in a sudden fit of rage when he shot Fonseca. Accordingly, Appellant's conviction for aggravated murder is affirmed.

Waite, P.J., concurs.

Robb, J., concurs.

Case No. 18 MA 0091

_____

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure.  It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**