[Cite as *State v. Miller*, 2015-Ohio-4678.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 14AP-851 |
| | | (C.P.C. No. 13CR-6792) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Troy C. Miller, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on November 12, 2015

*Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee.

*Jeremy A. Roth*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant Troy C. Miller appeals from a judgment entry of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of one count of aggravated robbery and one count of tampering with evidence. For the following reasons, we affirm.

I. Facts and Procedural History

{¶ 2} By indictment filed December 31, 2013, plaintiff-appellee State of Ohio charged Miller with one count of aggravated robbery, in violation of R.C. 2911.01, a first-degree felony; one count of kidnapping, in violation of R.C. 2905.01, a first-degree felony; and one count of tampering with evidence, in violation of R.C. 2921.12, a third-degree

felony.  The charges related to an incident at America's Best Value Inn during the early afternoon of January 8, 2013.  Miller entered a plea of not guilty to all three charges.

{¶ 3}  At a jury trial commencing September 22, 2014, the victim, J.R., testified that she was at America's Best Value Inn on the afternoon of January 8, 2013, for the purpose of a sexual encounter with a client.  J.R. is a self-described "escort," and she worked for her boss, Terrance Brandon, who would set up her sexual liaisons with clients. She was required to keep her phone on and connected to Brandon the entire time she was with a client as part of her security protocol.  J.R. testified that she thought she was supposed to be meeting a white male named Alan.  J.R. said that Brandon informed her that, during this encounter with the client, she was to take off her clothes but the client was not to touch her.  But when she walked into the hotel room, Miller "bombarded [her from] behind the door," and he was not who she was expecting to meet. (Sept. 22, 2014 Tr. 24.)  Before encountering him in the hotel room, J.R. said she had never seen Miller, had personal contact with him, spoken to him on the phone, nor exchanged text messages with him.

{¶ 4}  J.R. testified "[e]verything * * * just went south" from the moment Miller told her to sit on the bed.  (Sept. 22, 2014 Tr. 25.)  She testified that Miller told her to remove her clothing, and when Miller stood up to remove his own clothing, J.R. saw a knife underneath his jacket. J.R. asked him why he had a knife, and she said Miller pushed her down on the bed and proceeded to cut off her clothing with the knife.  He bound her hands behind her back with her underwear, and tied her feet with her phone charger.  She said Miller told her to choose between rape and robbery, and she told him to take what he wanted but not to hurt her.

{¶ 5}  J.R. testified that after Miller cut off her clothes and bound her arms and legs, the phone in the hotel room started to ring, followed shortly thereafter by someone knocking at the door.  J.R. said Miller then dragged her to the bathroom and shut her inside.  While she was inside the bathroom, J.R. said she was able to remove the restraints.  When she thought she heard the hotel room door open and then close, J.R. exited the bathroom and Miller was no longer in the hotel room.  J.R. locked the hotel room door.  J.R. noticed that her cell phone, wallet, and part of her phone charger were missing.  Eventually, J.R. said Brandon knocked on the door and told her he had a 911

operator on the line.  She took the phone from Brandon and told the dispatcher what had occurred.  J.R. testified that she never gave Miller permission to take any of her belongings, to tie her up, or to cut her clothing from her body.

{¶ 6}  After police arrived at the hotel room, a police officer drove J.R. to a separate location to identify a man they had apprehended "down the street not too far away."  (Sept. 22, 2014 Tr. 35.)  J.R. accompanied the police officer to the second location and identified Miller as the person who attacked her in the hotel room.

{¶ 7}  The state played an audio recording of the 911 call in open court.  When asked why she lied to the 911 operator about how Brandon knew she was in the hotel room, J.R. said she was "afraid that [Brandon] or his family might do something" if she disclosed she had been working as an escort for him.  (Sept. 22, 2014 Tr. 34.)  The prosecutor also asked J.R. about the initial statement she gave to a detective after the incident in which she again lied about being an escort, and J.R. said again she was "afraid of what could happen to [her]" if she told the police she was an escort who worked for Brandon.  (Sept. 22, 2014 Tr. 36.)  J.R. said that after a detective told her she could "go to jail for falsification," she then "came clean" in a second interview with a detective the next day and told him that she had been working as an escort at the time of the incident.  (Sept. 22, 2014 Tr. 37.)  J.R. said she no longer has contact with Brandon and had stopped working as an escort after this incident.

{¶ 8}  Officer Jason Gunther of the Columbus Division of Police testified that he was off-duty on the afternoon of January 8, 2013, but he heard the dispatch call regarding the incident at America's Best Value Inn and, because he was less than one-half mile away, responded to the scene to see if he could be of any assistance.  When he arrived at the scene, Officer Gunther saw a man on his phone in the parking lot who was pointing to a car passing him and told Officer Gunther "that's him, follow that guy."  (Sept. 22, 2014 Tr. 83.)  Officer Gunther turned around and followed the car in his unmarked vehicle, staying 20 to 30 yards behind him.  Officer Gunther saw in his rearview mirror that police cruisers were approaching and, within ten seconds of noticing the police cruisers, he saw "stuff" thrown out of the passenger side window of the car in front of him.  (Sept. 22, 2014 Tr. 85.)  Officer Gunther said he saw a man later identified as Miller throw numerous items from the car window and, over his police radio, tried to provide addresses of the

houses where items were thrown from the car.  Officer Gunther did not make the arrest, but he was present when another officer arrested Miller.

{¶ 9}   Officer Doran Carrier of the Columbus Division of Police testified that he responded to a dispatch call on the afternoon of January 8, 2013 about a "traumatic incident that had happened in one of the hotel rooms."  (Sept. 22, 2014 Tr. 69.)  Officer Carrier said that an off-duty officer had heard the dispatch call and was following Miller's vehicle, and that the off-duty officer aired on his police radio that Miller "had thrown some things out of the car window."  (Sept. 22, 2014 Tr. 70.)  Officer Carrier went to look for the items thrown from the car window and found a cell phone and what he described as a "clutch purse" in the area that the off-duty officer radioed the items were thrown.  (Sept. 22, 2014 Tr. 71.)  The "clutch purse" was returned to J.R. and did not go to the police property room.

{¶ 10} Officer Jeffrey E. Cubic of the Columbus Division of Police testified that he received a call to take over the "chain of custody" of a suspect who had been detained on January 8, 2013 about one-quarter of a mile away from the hotel.  (Sept. 22, 2014 Tr. 75.)  Officer Cubic identified the suspect as Miller.  When he first approached Miller, Officer Cubic noticed that Miller's zipper on his pants was down and when he searched Miller's person before putting him in the patrol car, he found a cell phone cord in Miller's jacket pocket.

{¶ 11} Timothy D. Cousins testified he was involved in an automobile accident on January 8, 2013, and while he was waiting for police on St. Clair Road, he found a cell phone in the snow that he picked up and gave to the police.  This phone was later identified as J.R.'s cell phone.

{¶ 12} Officer Christopher T. Riley of the Columbus Division of Police testified that he responded to the dispatch call on January 8, 2013, followed the suspect vehicle, stopped the vehicle, ordered the suspect out of his car, and handcuffed him.  After he had Miller in custody, Officer Riley went back outside to look for any other items that Miller might have thrown from the vehicle, and he saw "a silver tip of a knife" approximately one-half of one mile from where he stopped Miller's car. Officer Riley called for the crime scene detectives to come collect it.  (Sept. 23, 2014 Tr. 108.)  In her testimony, J.R. identified this knife as the one Miller used to cut off her clothes.  Officer Riley also noted

that Miller had dress pants on but the zipper was undone, and he did not remember seeing any underwear on Miller where the open zipper was gaping. An inventory of Miller's vehicle revealed a pair of men's underwear underneath the passenger seat.

{¶ 13} At the close of the state's evidence, Miller made a Crim.R. 29 motion for acquittal, which the trial court denied.

{¶ 14} Miller testified in his own defense. He said that he met with J.R. in the hotel room on the afternoon of January 8, 2013, but denied that he had agreed to pay her for escort services; instead, Miller said he met J.R. a few days prior at a bar and the two exchanged phone numbers and agreed to meet later "to have sex." (Sept. 23, 2014 Tr. 130-31.) Miller identified text messages on his phone from January 7, 2013 that he believed to be coming from J.R. which read "I am available." (Sept. 23, 2014 Tr. 136.) Another text message gave the location and said it would be "140 an hour," though Miller denied knowing J.R. worked for an escort service. (Sept. 23, 2014 Tr. 138.)

{¶ 15} Miller testified that when he arrived at the hotel on January 8, 2013, he called J.R. and she told him to come to her room. He said J.R. opened the door for him, invited him in the room, and told him to make himself comfortable. Miller said that J.R. told him he could take off his pants, and that she took off her pants on her own. Miller said he was in the room for five or ten minutes when J.R.'s cell phone rang, and she told Miller it was her boyfriend calling and that her boyfriend thought Miller was there "selling pills." (Sept. 23, 2014 Tr. 146.) He then said that J.R. told him she had a fetish that she wanted to be tied up and that she had a knife with her, but he told J.R. he was "not into that." (Sept. 23, 2014 Tr. 146.) Miller said the hotel room phone rang and then a car outside started beeping its horn. He looked out the window and saw a man in the parking lot indicating to him "yeah, we got you, we got you," and that J.R. told him the man was her boyfriend and that Miller needed to leave. (Sept. 23, 2014 Tr. 147.)

{¶ 16} Miller testified that when he left the room, J.R. had all of her clothes on except her pants, which she had removed on her own earlier. He said he ran out of the hotel room and went to confront the man he believed to be J.R.'s boyfriend because that man had Miller's car boxed in. Miller started to believe the entire rendezvous was "a setup" and thought he was going to "get robbed," so he got in his car and left. (Sept. 23, 2014 Tr. 148.) He did not deny throwing items out of his car window, but he said "[t]he

only thing [he] can think of is when [he] turned [his] back [J.R.] stuffed" the items into his jacket pocket.   (Sept. 23, 2014 Tr. 148.)  He said he threw the items out of the car window because he was afraid there might be drugs inside J.R.'s purse.  Miller denied seeing the police at the time he left the hotel parking lot.  Miller also denied ever tying J.R. up, binding her hands and feet, or putting her in the bathroom.

{¶ 17} On cross-examination, the state played a video recording of Miller's interview with police in which he told a detective that he understood he was being questioned because he "met a girl at a hotel off of Backpage."  (Sept. 23, 2014 Tr. 178.) Miller said he understood Backpage to be a website where people sell items and services, "adult services" among them. (Sept. 23, 2014 Tr. 177.)  Though he again denied knowing J.R. was an escort, Miller said the detective told him off camera "that girl is from one of these escort services," in an attempt to explain why he linked J.R. to Backpage during his police interview.  (Sept. 23, 2014 Tr. 179.)  Miller then said he "totally forgot" about telling the detective that he met J.R. at a bar a few days prior to January 8, 2013 and that she told him she was an escort who was on Backpage, so he went home and looked her up on the website.  (Sept. 23, 2014 Tr. 180.)  Miller further said that after viewing the video, he remembered telling the detective that he was supposed to pay J.R. $140 for her services even though he testified on direct examination that he did not know he was supposed to pay her and did not bring any money to give to J.R.  He also agreed that it was "possible" that he told the detective that J.R. gave her wallet to him in order for him to buy pills for her even though he testified on direct examination that the only explanation for how he ended up with her wallet was that J.R. must have shoved it in his jacket pocket when he was not looking.  Finally, despite testifying on direct examination that he did not cut J.R.'s clothes off, Miller agreed he told the detective in his prior statement that J.R.'s "fetish was to have a black man come to her hotel room, rip off her clothes and tie her up and, boom, I did that." (Sept. 23, 2014 Tr. 186.)

{¶ 18} Following deliberations, the jury returned a not guilty verdict on the kidnapping charge and guilty verdicts on the aggravated robbery and tampering with evidence charges.  At an October 16, 2014 sentencing hearing, the trial court imposed a sentence of six years imprisonment on the aggravated robbery conviction and one year on

the tampering with evidence conviction, ordering the sentences to be served concurrently. The trial court journalized its entry on October 20, 2014. Miller timely appeals.

## II.  Assignments of Error

{¶ 19}  Miller assigns the following errors for our review:

> [1.] Appellant was not afforded effective assistance of counsel as guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution because trial counsel failed to review Appellant's recorded statements to the police with him prior to his taking the stand to testify on his own behalf.
>
> [2.] The trial court erred when it entered judgment against Appellant when there was not sufficient evidence to support the guilty verdicts and conviction of Appellant.
>
> [3.] The trial court erred when it entered judgment against Appellant when the guilty verdicts returned by the jury were against the manifest weight of the evidence.
>
> [4.] The trial court erred when it denied Appellant's Rule 29 Motion for Acquittal at the close of the State's evidence with regard to the charge of Tampering with Evidence.

## III.  First Assignment of Error – Ineffective Assistance of Counsel

{¶ 20}  In his first assignment of error, Miller argues he was deprived of his constitutional right to the effective assistance of counsel.

{¶ 21}  In order to prevail on a claim of ineffective assistance of counsel, Miller must satisfy a two-prong test.  First, he must demonstrate that his counsel's performance was deficient.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  This first prong requires Miller to show that his counsel committed errors which were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.*  If Miller can so demonstrate, he must then establish that he was prejudiced by the deficient performance.  *Id.*  To show prejudice, Miller must establish there is a reasonable probability that, but for his counsel's errors, the result of the trial would have been different.  A "reasonable probability" is one sufficient to undermine confidence in the outcome of the trial.  *Id.* at 694.

{¶ 22}  In considering claims of ineffective assistance of counsel, courts indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101. Miller contends his trial counsel was ineffective in failing to adequately review the discovery materials and remind Miller of what Miller said in his interview with police. Miller suggests that if his trial counsel had reviewed his entire recorded statement to the police in the presence of Miller prior to trial, then Miller may not have chosen to testify in his own defense.

{¶ 23} "Tactical or strategic decisions, even if ultimately unsuccessful, will not substantiate a claim of ineffective assistance of counsel." *State v. Ryan*, 10th Dist. No. 08AP-481, 2009-Ohio-3235, ¶ 77, citing *In re M.E.V.*, 10th Dist. No. 08AP-1097, 2009-Ohio-2408, ¶ 34. "In general, a decision to allow a defendant to testify in his own defense constitutes a tactical decision." *State v. Hughes*, 10th Dist. No. 14AP-360, 2015-Ohio-151, ¶ 69, citing *State v. Washington*, 10th Dist. No. 98AP-1489 (Nov. 9, 1999). There is nothing in the record indicating Miller was testifying either in conformance with or in contradiction with his counsel's wishes. Additionally, though the many inconsistencies revealed between Miller's testimony and the statement he gave to police were admittedly damaging, Miller does not demonstrate that it was solely his testimony, and not the ample other evidence the state presented at trial, that caused the jury to convict him. Thus, Miller cannot satisfy the second prong of the *Strickland* test merely from the fact that his counsel allowed him to testify at trial. *Hughes* at ¶ 69.

{¶ 24} As to Miller's argument that his trial counsel was ineffective for failing to adequately review discovery materials and adequately prepare Miller to testify, the record again does not demonstrate that Miller is able to satisfy either prong of *Strickland*. While the record indicates that Miller's trial counsel did not sit down with Miller prior to trial and review Miller's entire recorded statement to police with Miller present, the record is clear that Miller's counsel did provide Miller with summaries of his police interview for Miller to review prior to trial. To the extent that Miller argues his counsel was deficient in failing to review the entire interview in the presence of Miller, Miller provides no authority for this proposition. Instead, the fact that his trial counsel provided him with summaries of his recorded interview with police contradicts Miller's assertion that his counsel must not have reviewed the police interview prior to allowing Miller to testify at trial. Accordingly, we overrule Miller's first assignment of error.

## IV. Second Assignment of Error – Sufficiency of the Evidence

{¶ 25} In his second assignment of error, Miller argues his convictions were not supported by sufficient evidence. We disagree.

{¶ 26} Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id*. The relevant inquiry for an appellate court is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt. *State v. Mahone*, 10th Dist. No. 12AP-545, 2014-Ohio-1251, ¶ 38, citing *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37.

### A. Aggravated Robbery

{¶ 27} The offense of aggravated robbery provides that "[n]o person, in attempting or committing a theft offense * * * or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it; * * * [h]ave a dangerous ordnance on or about the offender's person or under the offender's control; [or] * * * [i]nflict, or attempt to inflict, serious physical harm on another." R.C. 2911.01(A)(1) through (3). A "theft offense," pursuant to R.C. 2913.01(K), includes violations of R.C. 2911.02, robbery, and R.C. 2913.02, theft. Theft requires the state to prove beyond a reasonable doubt that Miller, with the purpose to deprive the owner of property, knowingly obtained control over the property without the consent of the owner or through deception, threat, or intimidation. R.C. 2913.02. A person acts with a particular purpose when "it is [his] specific intention to cause a certain result." R.C. 2901.22(A). A "deadly weapon," as defined in R.C. 2923.11, is "any instrument, device, or thing capable of inflicting death, and designed or specifically adapted for use as a weapon, or possessed, carried, or used as a weapon."

{¶ 28} J.R. testified that Miller pushed her down onto the bed, used a knife to cut off her clothing, and bound her hands and feet. J.R. further testified that Miller asked her to choose between rape and robbery, and she told him to take whatever he wanted but not hurt her. J.R. said Miller forced her inside a bathroom and then fled her hotel room with her cell phone, wallet, and part of her cell phone charger. J.R. was explicit that she did

not give Miller her possessions of her own free will. Police later recovered the knife, cell phone, and wallet in the locations where Officer Gunther radioed that he saw Miller throwing items out of his vehicle. When police apprehended Miller, they found part of the cell phone charger in his pocket.

{¶ 29} To the extent Miller argues that J.R.'s testimony is not credible and that Miller offered an equally plausible version of events, we are mindful that "[i]n determining whether a conviction is based on sufficient evidence, we do not assess whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Smith*, 10th Dist. No. 08AP-736, 2009-Ohio-2166, ¶ 26. Thus, based on the testimony of J.R. and police officers, there was sufficient evidence to support Miller's conviction for aggravated robbery.

### B. Tampering with Evidence

{¶ 30} R.C. 2921.12(A)(1) defines tampering with evidence and provides: "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any * * * thing, with purpose to impair its value or availability as evidence in such proceeding or investigation." To convict Miller of tampering with evidence, the state needed to submit sufficient evidence for the trier of fact to conclude Miller knew or should have known an investigation was forthcoming, but he nevertheless purposely took steps to conceal or remove the knife and stolen property so as to impair their availability in the investigation.

{¶ 31} "The law has long recognized that intent, lying as it does within the privacy of a person's own thoughts, is not susceptible of objective proof." *State v. Garner*, 74 Ohio St.3d 49, 60 (1995), citing *State v. Carter*, 72 Ohio St.3d 545, 554 (1995). The trier of fact may consider the entire set of circumstances surrounding the event and infer intent from those facts. *State v. Loughman*, 10th Dist. No. 10AP-636, 2011-Ohio-1893, ¶ 47, citing *State v. Grant*, 67 Ohio St.3d 465, 478 (1993).

{¶ 32} The state presented Officer Gunther's testimony that he was following Miller's vehicle as Miller fled the hotel and, only after seeing marked police cruisers in the rearview mirror, did he notice Miller throwing items out of the car's window. From this testimony alone, the jury could have concluded that Miller's purpose in throwing the knife, wallet, and cell phone out of his car window was to conceal the items from the

police, knowing that an investigation was forthcoming. Additionally, Miller admitted in his own testimony that he threw the items out of the vehicle, stating "I hear the police coming so I throw her purse out, throw her phone out and I throw the knife out." (Sept. 23, 2014 Tr. 149.) The jury could conclude from this testimony that Miller knew his conduct or the conduct of the individuals still at the hotel would have triggered an investigation. Thus, construing the evidence in a light most favorable to the prosecution, the state presented sufficient evidence to allow a rational trier of fact to find, beyond a reasonable doubt, that Miller purposely concealed evidence pivotal to the investigation into the aggravated robbery.

{¶ 33} Having concluded the state presented sufficient evidence to allow a rational trier of fact to find, beyond a reasonable doubt, that Miller committed the offenses of aggravated robbery and tampering with evidence, we overrule Miller's second assignment of error.

## V. Third Assignment of Error – Manifest Weight of the Evidence

{¶ 34} In his third assignment of error, Miller argues that even if there was sufficient evidence to sustain his convictions, his convictions for aggravated robbery and tampering with evidence were nonetheless against the manifest weight of the evidence.

{¶ 35} When presented with a manifest weight argument, an appellate court engages in a limited weighing of the evidence to determine whether sufficient competent, credible evidence supports the jury's verdict. *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4738, ¶ 32, citing *Thompkins* at 387. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a ' "thirteenth juror" ' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Determinations of credibility and weight of the testimony are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Thus, the jury may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 36} An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the

evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387. Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 37} Miller's entire manifest weight argument centers on the credibility of the witnesses. Specifically, Miller argues that because J.R. admitted to initially lying to police about working as an escort, the jury lost its way in believing her testimony over the testimony of Miller. We disagree. J.R. explained that she initially lied to police about working as an escort because she was afraid of what Brandon might do to her. However, her account of what happened inside the hotel room remained consistent from the time she spoke to the 911 operator to the time she testified at trial. Miller's testimony, on the other hand, was riddled with inconsistencies throughout and was markedly different from the version of events he told police. In light of this evidence, as well as the record in its entirety, we do not find the jury clearly lost its way in concluding Miller committed the offenses of aggravated robbery and tampering with evidence. Accordingly, we overrule Miller's third assignment of error.

## VI. Fourth Assignment of Error – Rule 29 Motion

{¶ 38} In his fourth and final assignment of error, Miller argues the trial court erred in denying his Crim.R. 29 motion for acquittal.

{¶ 39} Crim.R. 29(A) provides that the court, "on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." Review of the denial of a Crim.R. 29 motion and the sufficiency of the evidence apply the same standard. *State v. Fugate*, 10th Dist. No. 12AP-194, 2013-Ohio-79, ¶ 5, citing *State v. Turner*, 10th Dist. No. 04AP-364, 2004-Ohio-6609, ¶ 8, citing *State v. Ready*, 143 Ohio App.3d 748 (11th Dist.2001).

{¶ 40}  Miller asserts there was insufficient evidence to show that he had knowledge that an investigation was or was about to be underway, as required in order to convict him of tampering with evidence.  As we stated in our resolution of Miller's second assignment of error, however, Officer Gunther's testimony, standing on its own, was sufficient evidence to prove the elements of tampering with evidence.  Thus, even before Miller testified in his own defense, the state had presented sufficient evidence to support Miller's conviction for tampering with evidence, and the trial court did not err in denying Miller's Crim.R. 29 motion.  We overrule Miller's fourth assignment of error.

## VII.  Disposition

{¶ 41} Based on the foregoing reasons, the sufficiency of the evidence and the manifest weight of the evidence support Miller's convictions, and the trial court did not err in denying Miller's Crim.R. 29 motion for acquittal.  Additionally, Miller was unable to demonstrate ineffective assistance of counsel.  Having overruled Miller's four assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT and HORTON, JJ., concur.

_____