[Cite as *State v. Barnett*, 2020-Ohio-1468.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 19AP-365 (M.C. No. 18 CRB 20351) |
| Shermale Barnett, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on April 14, 2020

**On brief:** *Zachary M. Klein,* City Attorney, *Orly Ahroni,* and *Alexander Fowler,* for appellee. **Argued:** *Heather L. Keck.*

**On brief:** *Todd W. Barstow,* for appellant. **Argued:** *Todd W. Barstow.*

APPEAL from the Franklin County Municipal Court

NELSON, J.

{¶ 1} A jury found Shermale Barnett guilty of two counts of aggravated menacing and one count of public indecency. The trial court sentenced him to a total of 360 days in jail for those three misdemeanors. He appeals, arguing that the state's evidence was legally insufficient and his convictions were against the manifest weight of the evidence, and that the trial court admitted improper character evidence in violation of Ohio Evidence Rule 404(B). After review, we affirm the convictions.

{¶ 2} Pursuant to a complaint filed October 3, 2018, Mr. Barnett was charged with two counts of aggravated menacing under Columbus City Code 2303.21(A), each a misdemeanor of the first degree. The first count alleged that Mr. Barnett had threatened to rape J.B., and the second count alleged that he had threatened to kill K.B. The complaint also charged Mr. Barnett with one count of public indecency under Columbus City Code

2307.09(A), a misdemeanor of the third degree, based on the allegation that he had exposed his penis in view of others.

{¶ 3}   A jury trial began on April 23, 2019, and ended two days later.  The first witness called by the state was J.B., the thirteen-year-old daughter of R.B.  Tr. at 149.  She testified that on October 1, 2018, she lived in a row house condominium complex with her father and "his girlfriend and the babies." *Id.* at 150-51.  That day, J.B. was with her father R.B., his girlfriend K.B., and her "baby siblings" when she came into contact with Mr. Barnett. *Id.* at 152.

{¶ 4}   J.B. recounted that while she "was inside playing with the babies," her father "went outside to smoke a cigarette." *Id.*  Then, all she "heard was yelling. And then [K.B.] went outside to smoke a cigarette with [R.B.], so I was inside watching the babies.  And then the next thing I know, the babies are running outside. And then all I see is him playing with himself, and I'm trying to get the babies back inside, trying to make them not see." *Id.* at 153.  J.B. testified that Mr. Barnett "was stroking his penis. He pulled his stuff out and started doing that in front of everybody." *Id.* at 155.

{¶ 5}   When J.B. went outside to get the children, she heard Mr. Barnett "saying that he was going to take [K.B.] and rape her and that he would steal her from my Dad and to come suck his stuff." *Id.* at 154.  J.B. "went back inside with the babies and then everybody went back inside." *Id.*  She recalled that Mr. Barnett "was out back," where her father "heard him talking that he was going to snatch me up and rape me, because I was his." *Id.*

{¶ 6}   When asked how hearing "all of this" made her feel, J.B. replied that "it kind of made me feel fear, because my Dad does work a lot," leaving her home alone with the children. *Id.*  J.B. had a "fear that [Mr. Barnett] could have -- at any time he could have just walked up in the house at any time." *Id.* at 154-55.

{¶ 7}   When asked when the incident occurred, J.B. first replied "morning, mid-day," and then stated "[m]id-day, afternoon." *Id.* at 156.  When asked on cross-examination if she could be more specific, J.B. could not: "I'm not sure what timeframe. I'm sorry." *Id.* at 157.

{¶ 8}   K.B. also testified. *Id.* at 161.  She stated that she and R.B. had been "in the house" on October 1, 2018, when they "heard some noise." *Id.* at 165. After R.B. went

outside, K.B. "heard some arguing" and went out herself. *Id.* K.B. stated that Mr. Barnett "was threatening [R.B.], trying to get him to come off our front porch to come and fight him." *Id.* at 166. She described Mr. Barnett as "very loud" and "aggressive," and stated that "[h]e was shouting." *Id.*

{¶ 9} According to K.B., Mr. Barnett told R.B. "that his life was in his hands, and we needed to watch our backs because he was going to take them from us." *Id.* at 167. "He said he was going to take our lives, like he was going to kill us." *Id.* at 168. K.B. stated that Mr. Barnett made the threat to both her and R.B., and that it made her feel "scared" and "threatened" for herself and for her children. *Id.* K.B. further testified that "[s]hortly before" her children came out the door, Mr. Barnett "proceeded to whip out his penis and play with himself and say, I know you like this; I know you want this; let me show you what you're missing." He directed these statements to her, K.B. said. *Id.*

{¶ 10} K.B. also attested that Mr. Barnett told R.B. "that he was going to snatch his daughter, [J.B.], and he was going to rape her and kill her because she was his." *Id.* at 169. K.B. stated that both she and R.B. were present when Mr. Barnett made this statement. *Id.* After hearing it, K.B. called the police because she "felt threatened" and "feared for" her and her children's lives. *Id.* at 169. She believed that the encounter occurred "between 4:30-ish and 6:00 something, because it was pretty dark out when the cops got there" some 15 minutes or so later. *Id.* at 172-73.

{¶ 11} The state also called R.B., K.B.'s boyfriend and the father of J.B. and of K.B.'s two youngest children. *Id.* at 213. R.B. testified that he was on his front porch smoking a cigarette during his initial encounter that day with Mr. Barnett. *Id.* at 221-22. R.B. could not remember what time the encounter occurred. *Id.* at 222. According to R.B., Mr. Barnett "came from behind the carport * * * and was circling on his bicycle, or his kid's bicycle" while "shouting obscenities" at R.B. *Id.* at 223. Eventually, R.B. and Mr. Barnett were "shouting obscenities at each other" while approaching and retreating from one another. *Id.* at 227-28. Mr. Barnett cycled away and R.B. followed him, but then returned home when he believed that Mr. Barnett had gone. *Id.* at 229-30.

{¶ 12} R.B. testified that once he returned home, Mr. Barnett approached his porch "on foot" and "started yelling again." *Id.* at 231. R.B testified that J.B., K.B., and his two-year-old daughter "stepped out on the front porch to find out what all the yelling was

about," and "that's when Mr. Barnett pulled his pants down and started masturbating in front of us and telling my old lady she needs to get on her hands and knees and [perform oral sex]." *Id.* K.B. "proceeded to push [R.B.] into the house," after which he went to the back patio to smoke a cigarette. *Id.* at 231, 233. R.B. stated that Mr. Barnett then walked around to that area and began "yelling and talking shit again," and R.B. yelled back at him. *Id.* at 233. R.B. recounted: "And from that point, he then told me that he was going to rape and molest my daughter and that my daughter was his." *Id.* at 234.

{¶ 13} Officer Matthew Weber was one of the police officers who responded to K.B.'s call. *Id.* at 263. He testified that he received the call at "[r]oughly, 7:30-ish, around that time, give or take." *Id.* When he responded, he was wearing a body cam. *Id.* at 266-67. He and two other officers first spoke with K.B. *Id.* at 269. Officer Weber then went to speak with Mr. Barnett at his residence a few row houses away; the officer described Mr. Barnett as "very confrontational, didn't want to talk, didn't want to answer questions that we had for him." *Id.* at 270. The portion of Officer Weber's body cam footage showing him questioning K.B. was played for the jury during his testimony. *Id.* at 273; State's Ex. 8.

{¶ 14} Officer Thomas Livingston, another responding officer, also testified. Tr. at 282. He described Mr. Barnett's actions when the officers first came to the door to question him: "He was very hostile, asked what our business was at his door. He would not open the screen door. We asked him multiple times to come out, talk to us. He refused." *Id.* at 284. Officer Livingston testified that Mr. Barnett proceeded to tell the officers that he had been "with his children * * * at the store, and * * * that he got into an argument with a male that lived a few apartments down." *Id.* at 285. A portion of the footage from Officer Livingston's body cam was played for the jury during his testimony. *Id.* at 286; State's Ex. 9. Officer Livingston stated that although Mr. Barnett professed not to know why the officers were at his house, he also stated that he had told his wife that police were about to knock on their door. Tr. at 289-90. Officer Livingston agreed that, at approximately 23:18, the video showed Mr. Barnett "indicat[ing] he was going to threaten" R.B. *Id.* at 292.

{¶ 15} The state's final witness was C.R., a neighbor of both Mr. Barnett and R.B. *Id.* at 308. She testified that on October 1, 2018, she was sitting in her car with the windows down when she heard "yelling." *Id.* at 311. Because of this, she "was just notably watching what was going on. And then [Mr. Barnett] was standing in the walkway, and he pulled his

penis out." *Id.* C.R. believed this occurred "around 7:15" in the evening, but that it "was not dark" at that time and she could see. *Id.* at 311, 323. C.R. recounted that Mr. Barnett said "something vulgar, like, Oh, this dick takes all your bitches." *Id.* at 314. She stated that Mr. Barnett "hopped on" a child's bike and "took off" after the incident. *Id.* at 325. Although C.R. knew R.B.'s family because they were neighbors, she testified that she was not friends with them, and that she also knew Mr. Barnett "just [as] a neighbor." *Id.* at 319.

{¶ 16} After the state rested, the trial court informed the jury that the parties had stipulated that "on October 1, 2018, in Columbus, Ohio, sunset occurred at 7:15 p.m." *Id.* at 335.

{¶ 17} The defense called Mr. Barnett's son, L.B., as a witness. *Id.* at 336. He testified that on the day in question, Mr. Barnett was "going to the store" on L.B.'s "little sister's bike" around four or four-thirty in the afternoon, but "forgot his phone" and returned home to ask L.B. to get it for him. *Id.* at 337. At that point L.B. saw Mr. Barnett and R.B. begin to argue, and Mr. Barnett told him "to go in the house" before he "rode away down close to the carport." *Id.* at 339. According to L.B., Mr. Barnett returned at five or six o'clock. *Id.* Later on, Mr. Barnett "went to Kroger's and got some dinner," and when he came back around 7:40, "that's when the police were there." *Id.*

{¶ 18} Mr. Barnett testified in his own defense. *Id.* at 341. He stated that after he had returned home to get his phone, "there were words exchanged" and he "did argue with [R.B.]." *Id.* at 347. He said that he then went to the store, purchased cigarettes, and returned home. *Id.* at 348. Mr. Barnett denied having any encounter with K.B. or her daughter. *Id.* at 350. When asked to explain R.B.'s testimony that Mr. Barnett had threatened them and exposed himself, Mr. Barnett responded: R.B. "doesn't like me. I don't know why. I've never figured that out." *Id.*

{¶ 19} According to Mr. Barnett, his fiancé drove him to the store, and when he returned home around 7:50 p.m., the police "were there." *Id.* at 351-52. Mr. Barnett testified that he did not know why the police were at his door, and "was upset. I felt perturbed." *Id.* at 353. He asserted that J.B.'s testimony that he had exposed himself to her was "a very made-up story," and K.B.'s testimony was made up as well. *Id.* at 371. When asked if R.B.'s testimony was "a complete fabrication," Mr. Barnett replied: "Absolutely."

*Id.* at 372. He also claimed that C.R. lied during her testimony, even though he "personally" had "never had a problem with" her. *Id.* at 375.

**{¶ 20}** Although Mr. Barnett denied threatening J.B. or K.B., he admitted that he did threaten R.B at 4:30 in the afternoon on the day in question. *Id.* at 385-86. When asked to clarify what the threat had been, Mr. Barnett replied: "I told him not to speak to my son that way. If he wanted to, we could have done settled this." *Id.* at 386. He admitted that when speaking to the police, Mr. Barnett said, in reference to R.B., that he was "going to rip his fucking face off." *Id.*

**{¶ 21}** After deliberation, the jury returned guilty verdicts on all counts. *Id.* at 433. The trial court sentenced Mr. Barnett to jail terms of 180 days on each of the aggravated menacing convictions and 60 days on the public indecency conviction, with 60 of the 420 days suspended and a jail-time credit award of 45 days, for a total of 315 days. Mr. Barnett asserts two assignments of error for our review.

**{¶ 22}** Mr. Barnett's first assignment of error presents challenges to the legal sufficiency and the manifest weight of the evidence that supported his convictions: "The trial court erred and deprived appellant due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and Article One Section Ten of the Ohio Constitution by finding him guilty of aggravated menacing and public indecency as those verdicts were not supported by sufficient evidence and were also against the manifest weight of the evidence." Brief of Appellant at iii.

**{¶ 23}** To determine the legal sufficiency of the evidence, "[t]he relevant inquiry for an appellate court is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt." *State v. Miller*, 10th Dist. No. 14AP-851, 2015-Ohio-4678, ¶ 26, citing *State v. Mahone*, 10th Dist. No. 12AP-545, 2014-Ohio-1251, ¶ 38. "When presented with a manifest weight of the evidence challenge, an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-

Ohio-2501, ¶ 22, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Reversal on manifest weight grounds is appropriate " 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 24} Beyond the assignment of error itself and disputing the credibility of the witnesses against him, Mr. Barnett presents no specific argument challenging the sufficiency of the evidence. The jury did have evidence as to each element of each crime.

{¶ 25} The definition of aggravated menacing applicable to both Mr. Barnett's convictions is found in Columbus City Code 2303.21(A): "No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person or a member of the other person's immediate family." The first conviction concerned the threat to rape J.B., while the second concerned the threat to kill K.B.

{¶ 26} Examined under the required standard of review in a light most favorable to the prosecution, the state's evidence was legally sufficient to convict Mr. Barnett on each aggravated menacing count of which he was convicted. First, the testimony was legally sufficient to show that Mr. Barnett knowingly made threats against J.B. and K.B. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). Although Mr. Barnett urges us to disbelieve their testimony, the standard of review for legal sufficiency requires us to credit the state's witnesses. *Miller*, 2015-Ohio-4678, ¶ 26; *State v. Johnson*, 10th Dist. No. 13AP-997, 2015-Ohio-3248, ¶ 74, quoting *State v. Green*, 117 Ohio App.3d 644, 650 (1st Dist.1996) (" 'In reviewing a legal-sufficiency argument, a reviewing court cannot resolve evidentiary conflicts in favor of appellant or substitute its evaluation of witness credibility for the jury's.' "). R.B., J.B., and K.B. all testified that Mr. Barnett threatened to rape J.B. and kill K.B., and a victim's testimony "that she heard the threat" amounts to "sufficient evidence" that the defendant "acted knowingly" when committing aggravated menacing. *State v. Cruzbaez*, 1st Dist. No. C-180263, 2019-Ohio-2452, ¶ 14-15 (analyzing aggravated menacing under R.C. 2903.21(A)).

{¶ 27} J.B. testified that after the parties' initial confrontation, Mr. Barnett went "out back," where her father "heard [Mr. Barnett] talking that he was going to snatch me

up and rape me, because I was his." Tr. at 154. Although the state concedes that J.B.'s answer makes it unclear whether or not she heard the threat directly from Mr. Barnett, she was then asked "when you heard all of this, how did that make you feel?" *Id.* J.B. replied that "it kind of made me feel fear," implying that she did, indeed, in one way or another hear the threat. *Id.* The evidence was legally sufficient to support the conviction, no matter whether she heard the threat directly from Mr. Barnett or through a subsequent communication from her father or K.B. *See, e.g., In re Fugate*, 10th Dist. No. 01AP-1195, 2002-Ohio-2771, ¶ 10 ("To sustain an aggravated menacing conviction, a threat to cause harm need not be made directly to the intended victim but may be sufficient if made to a third-party to whom the defendant knew or reasonably should have known would convey the threat to the intended victim") (citations omitted).

{¶ 28} Second, the state's evidence was legally sufficient to show that Mr. Barnett's threats caused the victims to believe that he would cause each of them serious physical harm. J.B. further testified that she had a "fear that he could have -- at any time he could have just walked up in the house at any time." Tr. at 154-55. The sum of her testimony was legally sufficient to establish her fear that Mr. Barnett would do her serious physical harm. *State v. Goodwin*, 10th Dist. No. 05AP-267, 2006-Ohio-66, ¶ 22 (where victim "testified that she was fearful because she believed appellant was capable of using a gun and was making a serious threat," evidence was legally sufficient to sustain aggravated menacing conviction); *State v. Landrum*, 1st Dist. No. C-150718, 2016-Ohio-5666, ¶ 15-16 (a victim's "consistent assertions that she feared [the defendant] and felt threatened when [he] ran up to her with the butcher knife, threatening" her was sufficient to show her subjective belief that defendant "was going to cause her serious physical harm").

{¶ 29} The evidence was also legally sufficient to support Mr. Barnett's aggravated menacing conviction for threatening to kill K.B. She testified that Mr. Barnett "said he was going to take our lives, like he was going to kill us," and that this statement made her feel "scared" and "threatened" for herself and for her children. Tr. at 168. This testimony was enough to demonstrate that Mr. Barnett's threats caused K.B. to believe that he was going to cause her serious physical harm.

{¶ 30} Mr. Barnett was also convicted of public indecency under Columbus City Code 2307.09(A)(1), which states: "No person shall recklessly * * *, under circumstances in

which the person's conduct is likely to be viewed by and affront others who are in the person's physical proximity and who are not members of the person's household: * * * expose the person's private parts." Four witnesses, one of whom was a third party toward whom the action was not directed, testified that Mr. Barnett exposed his genitals in their physical proximity. J.B. testified that she saw Mr. Barnett "stroking his penis. He pulled his stuff out and started doing that in front of everybody." Tr. at 155. K.B. recalled how Mr. Barnett "proceeded to whip out his penis and play with himself." *Id.* at 168. R.B. testified that "Mr. Barnett pulled his pants down and started masturbating in front of us." *Id.* at 231. C.R. stated that Mr. Barnett "pulled his penis out." *Id.* at 311. The state needed to show that this conduct was "reckless": That is, the evidence had to show at least that Mr. Barnett acted "with heedless indifference to the consequences" or that he "disregard[ed] a substantial and unjustifiable risk that [his] conduct is likely to cause a certain result or is likely to be of a certain nature." *See* R.C. 2901.22(C). Given the consistent and graphic descriptions by the state's witnesses of the conduct in question, the evidence easily satisfied this standard.

{¶ 31} Mr. Barnett presents several arguments attacking the manifest weight of the state's evidence. He argues that the testimony "about the timing of this event" was inconsistent, placing the overall credibility of the state's witnesses in question. Appellant's Brief at 2. More specifically, he claims that himself, "his son and [J.B.] placed the event in the afternoon, about 4 pm," while K.B. "believed that it occurred between 4 pm and 6 pm" and C.R. "thought that it happened about 7:15 p.m." *Id.* at 2-3. J.B.'s testimony was uncertain as to time. After stating that the events had happened during the "morning, mid-day," and then stating "[m]id-day, afternoon," she conceded "I'm not sure what timeframe. I'm sorry" when asked to be more specific. *Id.* at 156-57. The timeframe estimates provided by Mr. Barnett and his son were not wholly at odds with K.B.'s. And while C.R. places the events much closer to the time the police were called, it was up to the jury to harmonize any inconsistencies or decide whether they affected the credibility of one or more witnesses: "[A]ny weight that should be given to alleged inconsistencies in the witnesses' testimony were determinations within the province of the jury, and such inconsistencies do not render a conviction against the manifest weight of the evidence." *State v. Mayes*, 10th Dist. No. 03AP-1154, 2005-Ohio-1769, ¶ 23 (citations omitted). "[A]s the trier of fact, the jury

was free to believe or disbelieve all, part, or none of the testimony of the witnesses presented at trial." *State v. J.S.*, 10th Dist. No. 15AP-959, 2016-Ohio-8267, ¶ 39, quoting *State v. Erickson*, 12th Dist. No. CA2014-10-131, 2015-Ohio-2086, ¶ 42.

{¶ 32} Mr. Barnett also argues that the fact that R.B. left the scene "immediately" after "dire threats against his girlfriend and daughter" had been made damages his credibility to the extent that his account of Mr. Barnett's behavior should not be believed. Appellant's Brief at 3. But R.B. explained that he told K.B. to call the police, and then left "[a]s soon as [he] was made aware" that she had in fact called them because he does not "deal with police. I avoid them at all costs." Tr. at 234. Thus, R.B. stated: "I did not leave until I knew that they were in route, because I was not about to leave my family like that." *Id.* at 234-35. Again, the jury was within its rights to credit this explanation rather than hold R.B.'s departure from the scene against him when evaluating his testimony. (We also observe that while he does not concede absence of reasonable doubt on the issue, Mr. Barnett in his briefing does himself suggest that it is "more likely" than not that he made the threats. Appellant's Brief at page (mis)numbered 3.)

{¶ 33} Because Mr. Barnett has failed to demonstrate that "the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed," we reject Mr. Barnett's assertion that the manifest weight of the evidence did not support his convictions. *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). We overrule his first assignment of error.

{¶ 34} Mr. Barnett's second assignment of error posits: "The trial court erred to the prejudice of appellant by allowing impermissible and irrelevant 'other acts' evidence." Appellant's Brief at 4. Invoking Evidence Rule 404(B) and the tripartite test of *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, Mr. Barnett faults the trial court for admitting the video recordings from the investigative officers' body cams that "depict [him] as argumentative, belligerent, rude and uncooperative with the officers." *Id.* at 4-5. He argues that "[h]is actions on the body cam footage bear no relevance to the charged conduct," and were only introduced for the impermissible purpose of suggesting to the jury that he "was a turbulent, threatening, violent person, and that he acted in conformity with that character." *Id.* at 5.

{¶ 35} The state argues that the acts in question—Mr. Barnett's behavior and statements made in the officers' recorded interview with him during their investigation of K.B.'s complaint—do not qualify as "other acts" under the holding of *State v. Rocker*, 10th Dist. No. 97APA10-1341, 1998 Ohio App. LEXIS 4145 (Sep. 1, 1998). Appellee's Brief at 20-23. In *Rocker*, a defendant who was charged with possession of cocaine discovered during a traffic stop challenged the admission of evidence including marijuana and cash as relating to "other acts" under Rule 404(B). 1998 Ohio App. LEXIS 4145 at *13, 20. Citing *State v. Long*, 64 Ohio App.3d 615, 617 (9th Dist.1989), we noted that "[e]vidence of a separate instance of criminal conduct is admissible where the crime is so connected with the charged crime that the facts of each are logically intertwined." *Id.* at *18. And in *Long*, the Ninth District Court of Appeals noted that evidence can be admissible "as an integral part of the immediate context of the crime charged," and that "[w]hen the other crimes evidence is so integrated, it is not extrinsic and therefore is not governed by Evid.R. 404(B)." *Long*, 64 Ohio App.3d at 617. In addition to holding that the marijuana was not "other acts" evidence, we held that "[t]he presence of drug dealing paraphernalia in the vehicle, and a fairly unusual amount of cash on appellant's person, go to the general circumstances of the case and the facts surrounding appellant's arrest, and do not *ab initio* constitute 'other acts' evidence in violation of Evid.R. 404(B)." *Id.* at *22, 18 (noting that when "the non-criminal conduct occurs simultaneously with the charged offense, the rule stated in *Long* would appear all the more applicable"). *See also State v. Anthony*, 11th Dist. No. 2013-L-021, 2013-Ohio-5652, ¶ 31 (defendant's violent reaction after officer's "statement that he was being charged was relevant to [his] state of mind" as well as a rebuttal to defendant's "theory propounded at trial" attacking victims' credibility, and not inadmissible under Evid.R. 404(B)).

{¶ 36} In this case, the body cam footage taken with Mr. Barnett began recording at 7:43 p.m., around half an hour after C.R.'s 7:15 estimate of the time she witnessed Mr. Barnett exposing himself, and in the immediate aftermath of K.B.'s 7:35 call to the police. Tr. at 268, 311, 266. The bulk of the exchanges between Mr. Barnett and the officers as recorded on the body cams related directly to his account of the events in question and to his adversarial relationship with R.B. After posing (certainly reasonable) questions about what the officers wanted of him, and after being advised by the officers that they were

investigating allegations of public indecency and threats and would get a warrant if he did not speak with them, Mr. Barnett did not decline to talk with the officers; instead, and before his arrest, he meandered into statements that implicated both timing (claiming, for example, to have been with his children from 6:00 p.m. on) and possible motive (asserting that R.B. had broken the window of his girlfriend's car, left Mr. Barnett's children stranded at a park, and otherwise righteously incurred Mr. Barnett's displeasure: "this [bad word redacted] won't come out and fight me like a God-damned man"). To some considerable extent, the recordings provide the defendant's own statements relating to the events and personalities at issue.

{¶ 37} Mr. Barnett does not specify with any precision what recorded "interactions" between him and the police ought not have been admitted and form the basis of his appeal, *see* Appellant's Brief at 4; rather, he seems to address "[t]he body cam footage" in its entirety, *see id.* at 5, 6. In any event, however, we do not reach whether and to what extent materials on the recordings constitute "other acts" evidence because on the specific facts of this case we could not find that the trial court erred were we to adopt the Rule 404(B) framework that Mr. Barnett proposes.

{¶ 38} "Trial court decisions regarding the admissibility of other-acts evidence under Evid.R. 404(B) are evidentiary determinations that rest within the sound discretion of the trial court. Appeals of such decisions are considered by an appellate court under an abuse-of-discretion standard of review." *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, syllabus. Ohio Evidence Rule 404(B) provides that: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." There are exceptions: such evidence "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.*

{¶ 39} The Supreme Court of Ohio has specified the following "three-step analysis" for trial courts considering the admission of other acts evidence under Evidence Rule 404(B):

> The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts

is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. See Evid.R 403.

*Williams*, 2012-Ohio-5695, ¶ 19-20.

{¶ 40} Here, we conclude that Mr. Barnett's responses and assertions to the police were relevant to jury consideration of the charges against him, relating as they did to the timing of events and to Mr. Barnett's disposition and vehemence of feeling toward R.B. The evidence was admissible for several of the "other purposes" stated in Evidence Rule 404(B): "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Mr. Barnett's responses to the officers' questions could be understood, for example, to suggest a timeframe that he deemed relevant to events; his description of a long running animosity toward R.B. provided background to and possible motive for the offenses; and his statement to the officers that "he was going to threaten" R.B. was further probative of intent. Tr. at 292. And applying Evid.R. 403(B), we do not find that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice to Mr. Barnett; we cannot say that the evidence "evokes a sense of horror, or appeals to an instinct to punish" to the degree necessary to result in "an improper basis for [the] jury decision," as required to satisfy Evidence Rule 403(B). *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172 (2001), quoting Weissenberger's Ohio Evidence, Section 403.3, 85-87 (2000).

{¶ 41} Mr. Barnett's conclusory argument on this issue, which simply asserts that "the body cam footage was unfairly prejudicial" because it "aroused the jury's emotions and appealed to an instinct to punish," does not identify any particular statement he made that might have had such an effect. Appellant's Brief at 7. We find none. *See, e.g., State v. Cole*, 2d Dist. No. 2013 CA 18, 2014-Ohio-233, ¶ 39 (holding that the admission of a video of the defendant was not prejudicial; although "the use of curse words may have portrayed [the defendant] in an unfavorable light, [the] profanity was not used to prove a character trait for which he acted in conformity," and nor was the "use of curse words, alone, * * * so prejudicial that the jury's viewing of the video deprived [defendant] of a fair trial"). Here, where the quickly loquacious Mr. Barnett spoke to matters at the core of the controversy,

and absent more specific arguments or identified excerpts, we cannot find that the trial court erred in admitting the officers' body cam footage.

{¶ 42} Finally, we note that even if the video presentation had violated the rule's prohibition on character evidence, the error would have been harmless. The Supreme Court has stated that "the real issue when Evid.R. 404(B) evidence is improperly admitted at trial is whether a defendant has suffered any prejudice as a result.  If not, the error may be disregarded as harmless error.  And while courts may determine prejudice in a number of ways and use language that may differ, they focus on both the impact that the offending evidence had on the verdict and the strength of the remaining evidence." *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, ¶ 25.  In this case, the state presented a number of witnesses who were directly involved, R.B., J.B., and K.B., plus the corroborating testimony of a disinterested third party, C.R., whose testimony was consistent and vivid. The state's evidence was strong enough that any unduly prejudicial effect from Mr. Barnett's record comments would have been marginal.  We overrule the second assignment of error.

{¶ 43}  Having overruled both of Mr. Barnett's assignments of error, we affirm the judgment of the trial court.

*Judgment affirmed.*

DORRIAN and LUPER SCHUSTER, JJ., concur.

_____